Robert G. WATSON

v.

Steve NORRIS, et al.

No. 3–87–0699.

United States District Court,
M.D. Tennessee,
Nashville Division.

Dec. 7, 1989.

Susan L. Kay, Vanderbilt Legal Clinic, Vanderbilt Law School, Nashville, Tenn., for plaintiff.

Stephanie Reevers, Office of the Atty. Gen. of Tenn., Nashville, Tenn., for defendants.

## MEMORANDUM

HIGGINS, District Judge.

This action under 42 U.S.C. § 1983 is before the Court on plaintiff's and defendants' objections to the Report and Recommendation (entered August 3, 1989; Docket Entry No. 51) of the Honorable William J. Haynes, Jr., U.S. Magistrate.

Plaintiff Robert G. Watson is a prisoner of the State of Tennessee. On September 3, 1987, he filed his complaint in the present action against the Commissioner of the Tennessee Department of Corrections, and against the warden and various officials of the Turney Industrial Center and Farm, where he was then incarcerated. After a hearing was conducted under the

provisions of 28 U.S.C. § 1915(d), the U.S. Magistrate determined, and by order entered February 9, 1988, the Court agreed, that numerous portions of the complaint were frivolous. On the surviving portion of the complaint, Watson alleges that, as a matter of practice and policy, the Turney Center deprives inmates in protective segregation of their constitutionally-guaranteed right of access to the courts by unreasonably limiting their access to prison law library materials and legal assistance.[1] The complaint seeks declaratory and injunctive relief as well as money damages.

Both parties moved for summary judgment—the defendants on January 17, 1989 (Docket Entry No. 40) and the plaintiff on January 18, 1989 (Docket Entry No. 45).

On August 3, 1989, the Magistrate issued his Report and Recommendation (Docket Entry No. 51), concluding that both motions for summary judgment should be denied, and the case set for a full trial. Objections to the Magistrate's Report were filed by both the defendants (August 24, 1989; Docket Entry No. 54) and the plaintiff (August 31, 1989; Docket Entry No. 57). A hearing on the objections for both sides was held before this Court on November 3, 1989.

The Federal Rules of Civil Procedure have for more than 50 years authorized motions for summary judgment upon the proper showing of the lack of a *triable* issue of material fact. Summary judgment is an integral part of the judicial system and is designed "to secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1.

Rule 56(c), Fed.R.Civ.P., provides for the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has recently addressed the proper inquiries to be made in considering a mo-

tion for summary judgment pursuant to Rule 56(c). "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Substantive law will identify those facts that are material, *i.e.,* which facts are critical and which facts are irrelevant in relation to the legal elements of the claim.

After the material facts are identified, the function of the Court is to determine whether there is a genuine issue for trial. The Court is not to weigh the evidence. The inquiry performed by the Court is "whether there is the need for a trial". *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Court must look to see if the evidence is so one-sided that one party must prevail as a matter of law. *Id.,* 477 U.S. at 252, 106 S.Ct. at 2512.

■ The burden of establishing that no issue of material facts exists is on the party moving for summary judgment. This burden is composed of two elements: (1) an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party, and (2) an ultimate burden of persuasion which always remains with the moving party. It is the moving party's task to negate, if it can, the claimed basis for the suit. If the moving party leaves any doubt as to the absence of a genuine issue then any doubt is resolved against the moving party. *Board of Education, Cincinnati v. Dept. of HEW, Region 5,* 532 F.2d 1070 (6th Cir.1976). Because the burden is on the movant, the evidence is construed in favor of the party

---

**1.** Plaintiff also asserted a claim as to conditions of confinement which was referred to the Spe-

cial Master in *Grubbs v. Bradley.*

opposing the motion and he is given the benefit of all favorable inferences that can be drawn from it. *U.S. v. Articles of Device Consisting of Three Devices, "Diapulse,"* 527 F.2d 1008 (6th Cir.1976). Once the moving party has carried its burden, the burden shifts to the nonmoving party. The nonmoving party then has an affirmative duty to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Celotex,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 273. Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the nonmoving party is required to go beyond the pleadings and by its own affidavits or by the depositions, answers to interrogatories, and admissions on file show that a genuine issue does exist. *Id.* The nonmoving party shall oppose the motion pursuant to Rule 56(c)'s evidentiary materials excluding the pleadings themselves. Affidavits are not necessary for summary judgment motions. *See* Fed.R.Civ.P. 56(a) and (b). If the nonmoving party carries its burden and the Court is of the opinion that there are disputed issues of fact, the usual procedure is to deny the motion for summary judgment and thereafter to determine the factual issues at trial.

■ Suits for violations of civil rights call for particularly close scrutiny of motions for summary judgment. *E.g., Tarleton v. Meharry Medical College,* 717 F.2d 1523, 1535 (6th Cir.1984); *Azar v. Conley,* 456 F.2d 1382, 1384, n. 1 (6th Cir.1972).

### THE TURNEY CENTER LIBRARY SYSTEM

■ As is usual for prisons of its type, Turney Center has a published summary of Policies and Procedures. Those relating to the law library were attached as an appendix to the plaintiff's memorandum in support of summary judgment (Docket Entry No. 46). The pertinent portions are excerpted as follows:

V. POLICY: Turney Center library shall operate law library allowing *all* inmates access to the legal library services.

VI. PROCEDURES:

A. The law library shall be open a minimum of 40 hours each week (Monday through Friday, 8:00 a.m. to 4:00 p.m. and 5:00 p.m. to 7:45 p.m. on Sundays 5:00 p.m. to 7:45 p.m.). Inmates must have a pass to go to the library.

B. The library staff shall monitor the use and borrowing of such books/documents. Hard cover books on legal matters shall be maintained only within the library. Copies may be made of certain legal documents requested by inmates free of charge. Case law will not be copied as these decisions are in a book (publication) and the inmate may cite the material in his complaint, brief, etc. Any material generated by the inmate i.e. copies of complaints, etc. is exempt from photocopying.

C. The librarian shall be responsible to assure that all law books are up-to-date and include at a minimum Tennessee State and federal constitutions, state statutes, and decisions, procedural rules and decisions and related commentaries, federal case law materials, court rules and practices, treatises and legal periodicals and indexes. The librarian shall contact the T.D.O.C. staff attorney to get recommendations for law library content. This shall be reviewed semi-annually to assure compliance.

D. Inmates in segregation may request up to three legal publications (books) or excerpts from publications (books). A written request must be made to the librarian. A library aide will check the publications, etc. out to the inmate and delivery [sic] the publications (books) etc. at 9:00 a.m. promptly the following day. Publications (books) etc. can be kept from 9:00 a.m. to 9:00 a.m. the next day. A library aide will pick up the books. A complete listing of library contents shall be circulated to segregated inmates.

E. The law library shall provide as needed upon request to the librarian, writing pens, carbon paper, plan free paper, and envelopes for inmates use in preparing legal correspondence and documents. No personal typewriters will be permitted in the library.

F. Personally-owned law books are permitted in a cell when space availability is not a problem.

G. T.D.O.C. policies available to inmates (see policy # 101.04.1) shall be maintained in a binder in the law library.

Obviously, provision "D" is the one of greatest interest to inmates in segregation, whether voluntary or involuntary. The deposition of Mike Slaughter, the Associate Warden for Treatment at Turney Center, indicates that if such an inmate made a written request for a particular book, it would usually be delivered to him on the same day (or if another inmate were already using it, the first day of its availability). A printed catalogue summarizing the law library's holdings was available to all inmates, including those in segregation. A copy of this catalogue is attached as Appendix I.*

### INMATE LEGAL ASSISTANCE AT TURNEY CENTER

There are two categories of people who are supposed to give legal assistance to inmates at Turney Center: paid legal secretaries and unpaid inmates who are commonly called "writ-writers" or "jailhouse lawyers." The legal secretaries are inmates whose chief prison job is assisting users of the prison law library. These functionaries are of little practical use to an inmate in segregation, since even if such an inmate requests to see one, the secretary is not allowed to enter the segregation unit unless he is also classified as a "jailhouse lawyer."

As for jailhouse lawyers, they are simply inmates who serve as amateur legal advisors for their fellow prisoners. In order to serve as an "official" jailhouse lawyer—admittedly a somewhat paradoxical concept—an inmate must be screened and approved by prison authorities. Jailhouse lawyers apparently receive no formal training, and receive no pay or compensation of any kind from the authorities.[2]

A list of accredited jailhouse lawyers is available to inmates in segregation. If such an inmate wants to see a jailhouse lawyer, he must select one from this list and submit a request to the administration, which then relays the request to the designated helper. The latter, *at his sole discretion*, then decides whether to enter the segregation compound to help the petitioner. If he decides not to, that is the end of the matter as far as that particular jailhouse lawyer is concerned; no one can make him help the inmate asking for assistance if he does not want to help.

### CONSTITUTIONAL REQUIREMENTS

The plaintiff objects that the Magistrate should have granted his motion for summary judgment, since the arrangements described above are, as a matter of law, insufficient to assure his access to the court system.

Since 1969 the Supreme Court has held that the states may not impose unreasonable obstacles to state prisoners' access to the courts. *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) established the rule that states may not categorically forbid inmates from serving as "writ-writers" or "jailhouse lawyers." This principle has been glossed by the federal courts as requiring "that the state provide some source of assistance for literate and illiterate inmates alike, tailored to their differing needs and abilities, which is designed to and does make realistically possible their purposeful communication with

---

* Editor's Note: Omitted for purposes of publication.

2. Unofficial compensation, however, is apparently not unknown. Plaintiff's deposition asserts that informal agreements between jailhouse lawyers and their "clients" commonly provide for remuneration of some sort. Watson alleged that this state of affairs is more or less an open secret. The deposition of Warden Slaughter supports this testimony. He testified that he had heard rumors of such arrangements and would not be surprised if they were true.

the courts." *Stevenson v. Reed*, 391 F.Supp. 1375, 1381 (N.D.Miss.1975), *aff'd* 530 F.2d 1207 (5th Cir.1976), *cert. denied*, 429 U.S. 944, 97 S.Ct. 365, 50 L.Ed.2d 315 (1976). The Supreme Court put its imprimatur on this corollary when it remarked that the right of access to the courts "required remedial measures to insure that inmates' access to the courts is adequate, effective, and meaningful...." *Bounds v. Smith*, 430 U.S. 817, 821–22, 97 S.Ct. 1491, 1494–95, 52 L.Ed.2d 72 (1977). With reference to the preparation of necessary legal documents, *Bounds* held that inmates must have access to a constitutionally adequate law library, sufficient assistance from people with legal skills, or some combination of the two. *Bounds* did not prescribe in detail what a constitutionally permissible system should be like.

There is general agreement that physical access to the law library, in the sense of unrestrained coming and going, is not constitutionally necessary. "We are concerned with a right of access to *the courts*, not necessarily to a prison law library." *Walker v. Mintzes*, 771 F.2d 920, 932 (6th Cir.1985) (rejecting claim of inmates to a guaranteed amount of time in the library). *See also, e.g., U.S. v. Evans*, 542 F.2d 805 (10th Cir.1976); *Hampton v. Schauer*, 361 F.Supp. 641 (D.Colo.1973). Reasonable time-and-place restrictions on the use of the library do not contravene any constitutional requirement. *E.g., Walker v. Mintzes, supra*, 771 F.2d at 932; *Twyman v. Crisp*, 584 F.2d 352, 357–58 (10th Cir.1978); *Gittlemacker v. Prasse*, 428 F.2d 1, 7 (3d Cir. 1970).

Because of the practical difficulties involved in doing research without free access to a library, however, courts tend to give close scrutiny to such "remote control" arrangements, and some expedients have been struck down as insufficient. *See, e.g., Williams v. Lane*, 851 F.2d 867, 879 (7th Cir.1988) (inmates allowed in library only on special cases); *Morrow v. Harwell*, 768 F.2d 619, 623 (5th Cir.1985) ("book-mobile" system found inadequate); *Jones v. Diamond*, 594 F.2d 997, 1024 (5th Cir.1979) (prisoners required to request one specific book; no assistance or advice from others).

A good summary of the problems posed by such systems was provided by the Fourth Circuit in *Williams v. Leeke*, 584 F.2d 1336 (1978):

> Simply providing a prisoner with books in his cell, if he requests them, gives the prisoner no meaningful chance to explore the legal remedies he might have. Legal research often requires browsing through various materials in search of inspiration; tentative theories may have to be abandoned in the course of research in the face of unfamiliar adverse precedent. New theories may occur as the result of a chance discovery of an obscure or forgotten case. Certainly a prisoner, unversed in the law and the methods of legal research, will need more time or more assistance than the trained lawyer in exploring his case. It is unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult.

584 F.2d at 1339.

This is not the first time that an action of this kind has been brought in this district. On July 25, 1985, the Honorable John T. Nixon entered an order adopting the Report and Recommendation (filed January 29, 1985) of the Honorable Kent Sandidge, U.S. Magistrate, in the case of *Scott v. Pelegrin*, No. 82–3526. *Scott* was unlike the present case in that it involved a system-wide challenge to Tennessee Department of Corrections policy, whereas the present action focuses on a specific facility. In discussing the interrelationship between an inmate's access to the law library and the availability of "jailhouse lawyers" to him, the Magistrate made the following perceptive comments:

> [I]f inmates housed in segregated confinement are to be prohibited from physically attending the law library, and are instead allowed only to have books and other legal materials brought to their cells upon request, they must have advance knowledge, through some means, of what books and materials are available and relevant to their research. Only

then would such a policy ensure "meaningful access" to the courts for these segregated inmates. [Jailhouse lawyer] assistance, of course, is essential to the implementation of such a policy, since even if segregated inmates are provided with a list of available materials, in the vast majority of instances they would have no idea where to begin their research without assistance from a more knowledgeable inmate. (*Scott*, Magistrate's Report at 17; emphasis added).

This passage underscores some of the difficulties with the Magistrate's Report in the present case. The Magistrate recommended denial of the plaintiffs' motion for summary judgment because questions of fact remained about the degree of legal training available to the jailhouse lawyers. (Report and Recommendation at 16). However, it does not matter what their training was if Watson has no effective access to them, and the *uncontradicted* testimony of both Watson and the prison officials establishes that the decision whether or not to respond to a call for assistance from the segregation unit rests in the *sole discretion* of the jailhouse lawyer. Concern about this state of affairs is heightened by Watson's assertion that voluntarily segregated inmates are often regarded as collaborators or "stool pigeons" by the general prison population, who therefore bear them a grudge.[3] But, even if that point is waived, it remains true that such an inmate's access to knowledgeable legal help must depend on the unilateral choice of another. If that other chooses not to respond—whatever the reason—the inmate is simply out of luck. As a matter of law, such a situation is obviously unsatisfactory. If other individuals—whether they be prison officials or fellow inmates—have it in their power to give or deny legal assistance to inmates as their whimsy takes them, then any inmate so deprived has been denied his constitutional right of effective access to the courts. The Court disagrees with the Magistrate and finds

summary judgment as to these issues should have been granted to the plaintiff.

## DEFENSE OF QUALIFIED IMMUNITY

■ A different problem is presented by that part of the complaint which seeks monetary damages from certain of the defendants. The defendants answered that, as a matter of law, they are shielded from personal liability because they enjoy qualified immunity from suit under § 1983. They repeat this argument in their objections to the Magistrate's Report, although the Magistrate did not specifically address the question.

The defense of qualified immunity arose from the need to balance the interest in compensating victims of governmental abuse against the risk of making people either reluctant to assume government jobs or to do them with the necessary resolution for fear of personal liability. In an important recent case on the issue, the Supreme Court said:

Our cases have accommodated these conflicting concerns by generally providing government officials with a qualified immunity, shielding them from civil damages ... as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.

*Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (citations omitted).

The law of qualified immunity is governed by a line of decisions stemming from *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *Harlow* brought about a significant change in the law by emphasizing the need for an objective standard in determining the availability of the defense. Subsequent decisions have reemphasized the standard:

*Harlow v. Fitzgerald* rejected the inquiry into [the official's] state of mind in favor of a wholly objective standard.... Whether an official may prevail in his

---

3. The defendants point to records showing that Watson made only one written request for assistance from a jailhouse lawyer. However, if Watson believed that the general population regarded him as a "snitch," he probably considered that such requests would have been futile and pointless.

qualified immunity defense depends on the objective reasonableness of [his] conduct as measured by reference to clearly established law. No other circumstances are relevant to the issue of qualified immunity.

*Davis v. Scherer,* 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984) (citations and internal quotations omitted).

The current test, as summarized by the Sixth Circuit, is this: if the qualified immunity defense is raised, the plaintiff must show a violation of the constitutional right or rights and "that these rights were so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to refrain from such conduct." *Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir.1987).

The Supreme Court has cautioned that a plaintiff cannot defeat a defense of qualified immunity merely by alleging violation of "extremely abstract rights." *Anderson, supra,* 483 U.S. at 639, 107 S.Ct. at 2029; rather, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized ... sense." *Id.,* 483 at 640, 107 S.Ct. at 3039.

This naturally raises the question of how a lower court is to determine when law is "clearly established." Upon what authority may a district court rely to settle that question? In this circuit, at least, the answer is clear:

Our review of the Supreme Court's decisions and of our own precedent leads us to conclude that, in the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself. In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law. For the decisions of other courts to provide such 'clearly established law,' these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to

leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.

*Ohio Civil Service Employees Ass'n. v. Seiter,* 858 F.2d 1171, 1177 (6th Cir.1988).

From the discussion of the constitutional issues surrounding library access and inmate legal assistance, it is clear as a matter of law that the plaintiff cannot meet this standard. No "particularized" expression of the constitutional rights involved here has been enunciated by the pertinent authorities. On the contrary, the Supreme Court's *Bounds* decision seems to assume that a large number of expedients will be employed as prison officials try to meet these needs. Guidance has almost necessarily been given in general terms, with particular arrangements being judged on a case-by-case basis. This is as it should be, since federal courts neither can nor should oversee the day-to-day operation of prisons in minute detail.

Although this Court has found that the arrangement at Turney Center is insufficient, it notes that there was no body of authority such that any reasonable officer should have known in advance that it was unconstitutional. Therefore, the defendants are entitled to the defense of qualified immunity, and the defendants should be granted partial summary judgment as to that issue.

An appropriate order will be entered.

## ORDER

In accordance with the memorandum contemporaneously filed, the defendants' motion for summary judgment (filed January 17, 1989) is granted in part, insofar as it pertains to the defense of qualified immunity, and the plaintiff's claim for monetary damages is dismissed with prejudice. In all other respects, the defendants' objections to the Magistrate's Report and Recommendation are not well taken, and as to those issues their motion for summary judgment is denied.

Subject to the exceptions discussed in the preceding paragraph, plaintiff's objections

588

to the Report and Recommendation of the Magistrate are sustained, and plaintiff's motion for summary judgment (filed January 18, 1989) is granted. The Court hereby finds that the policy and practice of the Turney Center governing access to the prison library and the availability of legal assistance to inmates in segregation are unconstitutional and are violations of the Fourteenth Amendment. The defendants are hereby enjoined from enforcing these policies.

Within thirty (30) days of the date of entry of this order on the docket, the parties shall submit a proposed plan to remedy the constitutional deficiencies in the policy and practice at the Turney Center governing access to the prison library and availability of legal assistance to inmates in segregation.

It is so ORDERED.