Cheryl **KLINGER**, et al., Plaintiffs,

v.

**NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES, et al., Defendants.**

No. 4:CV88–L–399.

United States District Court, D. Nebraska.

Oct. 13, 1995.

Gail S. Perry & Stephanie F. Stacy, Baylor, Evnen, Curtiss, Grimit & Witt, Lincoln, NE, for Plaintiffs.

Don Stenberg, Attorney General, Laurie Smith Camp, Deputy Attorney General, Lincoln, NE, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW AND RELATED MEMORANDUM AND ORDER

KOPF, District Judge.

A bench trial has now been completed on the issue of damages [1] stemming from the court's previous finding that defendants Lofgreen and Tewes violated the plaintiffs' constitutional right to access to the courts. *Klinger v. Nebraska Dep't of Correctional Servs.*, 824 F.Supp. 1374, 1434–1438, 1449–52, 1464–65, 1468 (D.Neb.1993) (*Klinger I*), rev'd on equal protection grounds, 31 F.3d 727 (8th Cir.1994), cert. denied, —— U.S. ——, 115 S.Ct. 1177, 130 L.Ed.2d 1130 (1995) (*Klinger II*).[2]

I now issue my findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) on the issue of damages. In addition, I shall enter an order scheduling the filing of an application for attorney fees and a response thereto.

---

1. There is no basis for injunctive relief in this case because the violation ended in January of 1989, and there is no evidence or claim that such a violation is likely to reoccur. *Klinger I*, 824 F.Supp. at 1464–65.

2. For this court's ruling on remand from *Klinger II* on the issue of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 (Title IX), see *Klinger v. Nebraska Dep't of Correctional Servs.*, 887 F.Supp. 1281 (D.Neb.1995) (in light of the findings of *Klinger II* that men's and women's prisons in Nebraska were not factually comparable, women were not denied equal education on the basis of sex in violation of Title IX) (*Klinger III*).

## I. Findings of Fact and Conclusions of Law [3]

### Prior Liability Determination

1. To summarize and restate, in *Klinger I* I decided the following as to liability on the access-to-the-courts claim:

A. In 1977, the Supreme Court in *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977) (footnote omitted) held that " 'the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.' " *Klinger I,* 824 F.Supp. at 1464 (Finding and Conclusion (F & C) 144).

B. In January and June, 1988, Magistrate Judge Piester and Judge Urbom found in *Reutcke v. Dahm,* 707 F.Supp. 1121, 1132 (D.Neb.1988) that " '[t]he simple fact is that if the state denies a prisoner direct physical access to a law library, the state must provide that prisoner, no matter what his status, with assistance by trained, skilled, and independent legal personnel.' " *Klinger I,* 824 F.Supp. at 1464 (F & C 145).

C. It was not until sometime in January, 1989, that a trained inmate legal aide was appointed to assist NCW inmates. *Id.* (F & C 147).

D. The orientation and segregation inmates at NCW had no physical access to the law library until November, 1989. (*Id.*) (F & C 148).

E. A violation of *Bounds* had been established regarding the inmates who were in segregation or orientation at NCW until January, 1989, since these inmates had no physical access to the law library or the assistance of a trained legal aide. The *Bounds* violation ended in January of 1989 when a trained and independent inmate legal aid was appointed. *Id.* (F & C 149).

F. Prior to January, 1989, Plaintiffs had proven a violation of *Bounds* regarding general population inmates because: (a) no trained and independent inmate legal aide had been appointed; and (b) the law library was not adequate in that one had to "stand in the aisle" because the only table was a small typewriter stand, and the legal materials were not organized but "just were kind of piled all over." As to general population inmates, this violation ended in January of 1989 when a trained and independent inmate legal aid was appointed. *Id.* at 1465 (F & C 153).

G. Since it was their policies which ran afoul of *Bounds,* Lofgreen and Tewes (former superintendents at NCW) are liable for the access-to-the-courts violations. *Klinger I,* 824 F.Supp. at 1468 (*citing Reutcke,* 707 F.Supp. at 1134) (F & C 194).

H. The physical condition of the law library was the "policy" of the superintendents. This is evident from the small size of NCW and the fact that Wayne (a superintendent of NCW who followed Tewes and Lofgreen) recognized that he was dealing with "policy" when he moved the library upon becoming superintendent so "it would be easier to find volumes and reference material they were seeking." *Id.* (F & C 195).

I. The restrictions on segregation and orientation inmates' physical access to the law library was a "policy" of the superintendents; for example, inmate Younger testified that Lofgreen personally denied her access to the law library when she was in segregation and Tewes approved a policy of denying physical access to the law library when he authorized segregation inmates to have law books in segregation (a policy which also violated *Bounds,* according to *Reutcke,* 707 F.Supp. at 1130). *Klinger I,* 824 F.Supp. at 1468 (F & C 196).

J. Lofgreen and Tewes knew there were no trained inmate legal aides, and they knew the inmates claimed to need help, as evidenced by (a) the Lange grievance to Lofgreen in June, 1988, (b) the Lange communication form regarding

---

3. Any finding of fact that is more properly construed as a conclusion of law shall be so construed, and any conclusion of law that is more properly construed as a finding of fact shall be so construed.

writing to the NSP legal aide answered by Tewes in August, 1988, and (c) the Lange correspondence about assisting an inmate in segregation answered by Tewes in August, 1988. *Id.* (F & C 197).

K. Under *Bounds* and *Reutcke*, the claims regarding access to the courts involved well-established areas of the law, and therefore defendants Lofgreen and Tewes were not entitled to qualified immunity. *Id.* at 1469 (F & C 203).

### Motion for Reconsideration

■ 2. On March 20, 1995, (Filing 703) this court gave all parties leave to file motions "requesting that the court reconsider any of the findings and conclusion[s] set forth in ... [*Klinger I* ] pursuant to Fed.R.Civ.P. 54(b)" and the court further directed the parties to "file such a motion, with a supporting brief, by April 10, 1995."

3. On April 24, 1995, Defendants submitted a brief to the court wherein they stated: "The Court's opinion ... is clear and should stand on its own merits, as modified by the Court of Appeals." (Br.Opp'n Pls.' Mot.Am.Opinion Pursuant to FRCP 54(b) at 1.) In that same brief, Defendants noted that no motion for reconsideration had been filed by Defendants, *id.*, and Defendants requested "that this case proceed forward to the damage phase of the trial on the only remaining issues—those related to the Plaintiffs' access-to-the-courts claims." *Id.* at 8.

4. Defendants never requested a modification of the court's earlier liability determination regarding access to the courts set forth in *Klinger I* until after the damage trial [4] was concluded on September 18, 1995.

5. On September 20, 1995, Defendants filed a motion (Filing 717) styled "Motion to

Alter or Amend Findings of Fact and Conclusions of Law" alleging essentially two things. First, Defendants submitted that recent decisions from the United States Court of Appeals had clarified the law and established that Plaintiffs did not meet their burden of proof on liability. Secondly, Defendants argued that evidence introduced at the damage phase of trial also revealed that some of the court's earlier liability determinations were erroneous.

6. Given the Court's earlier order of March 20, 1995 (Filing 703), the September 20, 1995, motion (Filing 717) is untimely.

7. Given the urging of Defendants in their brief of April 24, 1995, that the court not modify its previous liability determination, Defendants' September 20, 1995, motion, coming after the damage trial had been completed, would, if granted, unfairly surprise and prejudice Plaintiffs.

8. None of the cases cited by Defendants in support of their September 20, 1995, motion materially changed the law insofar as liability is concerned, and all of the cases relied upon by Defendants were published substantially before trial on the damage phase began. *See, e.g., Schrier v. Halford,* 60 F.3d 1309 (8th Cir.1995) (July 27, 1995).[5]

9. There is no factual merit to Defendants' claim that evidence adduced at the damage phase of trial materially contradicted the essential basis of the court's earlier access-to-the-courts liability determination. For example:

A. As to the issue of whether the law library was inadequate for general population inmates because the materials were disorganized and the library was too small, the law librarian [6] at NCW testified at the

---

4. As a matter of fact, after all the evidence was presented at the damage trial, counsel for the defendants stated "that the effort we have made is not to relitigate." (One–Volume Damage Trial Transcript of Sept. 18, 1995, 130:18–19) (hereinafter "D.T.").

5. For example, unlike *Schrier*, there was no issue in this case about whether NCW was constitutionally required to provide a law library for medical malpractice claims even if the law library was otherwise adequate for other types of

claims. Rather, the plaintiffs' claim was, and the evidence showed, that the law library was inadequate for all legal research matters, including criminal, habeas corpus, and civil rights actions (as well as general civil matters) because the library was too small and because it was disorganized.

6. Ms. Janice Axdahl, the librarian, was an extremely credible witness who was grossly overworked. As I noted in *Klinger I,* 824 F.Supp. at 1436, "Ms. Axdahl was an NCW staff member

damage phase of trial. She buttressed the previous liability determination, particularly as to the crowded and disorganized ("piled all over") condition of the library. She testified that in the summer of 1988 the law library "shelves are crowded. There are materials on the floor because we were waiting. We know we need to move. It's getting full. It's filling up." (D.T. 68:16–19). She also testified that "books were placed on top of the other books" (*id.* 47:10–11), there "were some books stacked on the floor" (*id.* 47:13–14), and, at least for books on the floor, the books "may not have been in specific numeric order." (*Id.* 47:22). She further testified during the damage phase of trial that it would have been apparent to a first-time observer that something needed to be done in the summer of 1988:

> THE COURT: If someone new walked into that law library, never seen it before?
>
> THE WITNESS: Yes.
>
> THE COURT: Would it have been apparent to that person that something needed to be done, that some change needed to be made?
>
> THE WITNESS: Most likely.
>
> THE COURT: And why do you say that?
>
> THE WITNESS: Because of the crowded condition.
>
> (D.T. 69:12–20).[7]

B. As to the issue of whether inmates in segregation and orientation were denied physical access to the law library until 1989 when Wayne became superintendent[8], the librarian corroborated this determination as well:

> Q. .... You said you didn't remember the time frame, but you remember sometime during Larry Wayne's administration when there was a formalized way for segregation inmates to get physical access to the law library?
>
> A. Yes.
>
> Q. And before that, there wasn't any routine plan for that?
>
> A. Well, the OM [operational memorandum] provides, the OM that was rewritten in '88, in September of '88 does provide for that access, but there is nothing specific.
>
> Q. Right. And so and there wasn't any publication that you know of that the inmates could request that kind of physical access?
>
> A. Not that I recall.[9]
>
> (D.T. 61:7–20).

10. The motion (Filing 717) styled "Motion to Alter or Amend Findings of Fact and Conclusions of Law" should be denied.

### Liability Theory

■ 11. A complete and systematic denial of an inmate's constitutional right of access to the courts is such a fundamental constitutional deprivation that it is injury in and of itself for liability purposes without a showing of actual injury or actual prejudice. *Jones v. James*, 38 F.3d 943, 945 (8th Cir.1994) (recognizing principle, but holding that inmate's claim—if he had been allowed free

---

whose duties were many. For example, she was involved in education, orientation and recreation at NCW at various times."

7. The librarian further stated that there was "a" chair and square table in the library in addition to a typewriter stand. (D.T. 69:6–11). While this testimony is slightly different than what I had earlier understood for purposes of the liability determination, as noted in the text, the librarian nevertheless confirmed at the damage trial that it was apparent that something needed to be done "[b]ecause of the crowded condition." (D.T. 69:15–20.) In all material respects, the librarian's testimony at the damage phase of trial was entirely consistent with the inmate legal aide's liability phase testimony. Linda Lange, the inmate legal aide, testified that the law library was inadequate because it was too small and the legal materials were not organized. (Liability Trial Transcript (L.T.) Vol. X, 2636:17–25; 2637:1–2638:12; 2649:9–15; 2650:6–14).

8. During the liability phase of trial Wayne testified that "[i]n the fall of 1989, I initiated a procedure by which women housed in the segregation unit could have physical access to the law library at NCW." (L.T. Vol. XIII 3634:14–17). And Wayne further stated that it was "after I arrived at NCW [January 5, 1989], orientation women were provided access to the law library." (*Id.* 3638:16–18).

9. Thus, the actual practice did not change.

mailing privileges some attorney might have taken his case—was too speculative); *Hershberger v. Scaletta,* 33 F.3d 955, 956 (8th Cir.1994) (applying the principle, and upholding injunction barring postal charge for legal mail regarding inmates in segregation); *Klinger I,* 824 F.Supp. at 1435 n. 115; *Reutcke,* 707 F.Supp. at 1129.

12. On the other hand, if the alleged denial of the right of access to the courts does not amount to a complete and systematic denial, then an inmate plaintiff must prove actual injury or prejudice in order to establish liability. *Schrier,* 60 F.3d at 1313 (appointment of lawyer sufficient access to the courts to require inmate to show actual injury or prejudice); *Hamm v. Groose,* 15 F.3d 110, 112 (8th Cir.1994) (where inmate legal aides claimed they were impeded in rendering assistance to illiterate inmates, but inmates had access to the law library, the failure to assert actual injury or prejudice justified dismissal).

### Damage Theory

13. There are three types of damages which are normally recoverable once liability has been established in a civil rights case such as this one: actual or compensatory damages, nominal damages, and punitive damages. *Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit* § 4.51 at 73 (West 1995) (Committee Comments).

14. "[A]ctual or compensatory damages are to 'compensate persons for injuries that are caused by the deprivation of constitutional rights,' and not 'undefinable value of infringed right' or 'presumed' damages." *Id.* (quoting *Memphis Community Sch. Dist. v. Stachura,* 477 U.S. 299, 307, 309, 106 S.Ct. 2537, 2543, 2544, 91 L.Ed.2d 249 (1986)).

15. Actual damages, which may include out-of-pocket losses, other monetary losses, or losses for personal humiliation, mental anguish and suffering, must, nevertheless, be the "direct result" of the "conduct of the defendant" in order to be recoverable. *Id.* § 4.51 at 72.

16. Nominal damages are appropriate where the finder of fact is unable to place a monetary value on the harm suffered by the plaintiff. *Id.* § 4.52 at 74. *See also Cowans v. Wyrick,* 862 F.2d 697, 699 (8th Cir.1988).

17. "Presumed" damages may be awarded as a substitute for actual or compensatory damages only in those rare situations "[w]hen a plaintiff seeks compensation for an injury that is likely to have occurred but difficult to establish." *Stachura,* 477 U.S. at 310–11, 106 S.Ct. at 2544–45.

18. "Presumed damages" have historically been limited to those classes of cases where the law, without requiring proof of damage, has inferred "substantial money damages" merely from proof of liability, such as where a person is wrongly prohibited from voting in a particular election or in cases of actionable slander. *Id.* at 311–12 n. 14, 106 S.Ct. at 2545–46 n. 14.

19. Although the "precise impact *Stachura* will have on the availability of presumed damages in section 1983 actions remains to be seen," 2 Joseph G. Cook & John L. Sobieski, Jr., *Civil Rights Actions* ¶ 4.07 at 4–58.3 (1995), when one is dealing with the normal type of case where "damages are readily measurable," presumed damages are not appropriate. *Lewis v. Harrison Sch. Dist. No. 1,* 805 F.2d 310, 317 (8th Cir.1986), *cert. denied,* 482 U.S. 905, 107 S.Ct. 2481, 96 L.Ed.2d 374 (1987) ("Any door left open by *Memphis [Stachura]* is not for plaintiffs like Lewis, whose damages are readily measurable.") (footnote omitted).

20. Because there is no Eighth Circuit precedent authorizing "presumed damages" in a case like this one, because historically presumed damages have not been awarded in cases like this one, and because actual or compensatory damages are normally measurable in cases like this one, a violation of the right to access to the courts, even if the violation is complete and systematic, is not the type of injury where "presumed damages" may be used as a substitute for actual or compensatory damages. *Reutcke,* 707 F.Supp. at 1136.

21. The purpose of punitive damages is to "'punish the defendant for his willful or malicious conduct and to deter others from similar behavior.'" *Id.* (*quoting Stachura,* 477 U.S. at 306 n. 9, 106 S.Ct. at 2542 n. 9).

22. Imposition of punitive damages requires a showing of reckless and callous indifference to the plaintiffs' rights. *Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit* § 4.53 at 76.

23. Whether to award punitive damages, and the amount of those damages, is within the sound discretion of the fact-finder. *Id.*

**Liability: General Population Inmates**

24. In general, for the time period prior to January, 1989, the plaintiffs proved a complete and systematic violation of *Bounds* regarding general population inmates because: (a) no trained and independent inmate legal aide had been appointed; and (b) the law library was not adequate in that it was too small and its collection was disorganized.

25. In particular, the NCW law library at all pertinent times was so disorganized that the condition of the law library amounted to a complete and systematic denial of access to the courts under *Bounds,* even though the general population inmates at NCW had physical access to the library. Simply stated, access to a disorganized pile of books stored in a small room "[b]arely big enough to turn around in" (L.T. Vol. I, 143:9–10) is not access to a law library.

26. For example, Linda Lange, who later became the inmate legal aide, testified, in response to a question dealing with the organization of the library, that before she organized the law library in January of 1989 when she became the aide: "I wasn't able to use most of the stuff." (L.T. Vol X, 2638:9–12). Indeed, Lange testified that the first thing she did when she was appointed inmate legal aide was to "organize it," "clean it up," and "do an inventory." (*Id.* 2650:8–9.) Prior to this time "[y]ou couldn't really organize it because the books were piled all over be-

cause there was no shelf to put them on, so they just stayed piled." (*Id.* 2650:11–13).

27. The law library was so disorganized that it did not even contain accurate and up-to-date copies of the operational memorandum and administrative regulations that guided all Nebraska prisons and DCS. (L.T. Vol. I, 147:4–16) ("not in any particular sequence" and "outdated"). For example, inmate Cheryl Klinger, who had experience as a legal secretary (*id.* 144:7–8; 145:11–13) and as a secretary for a parole administrator (*id.* 120:11–13), could not "match up" operational memorandum and administrative regulations that were found in the NCW library with copies of "OMs" and "ARs" received from other Nebraska penal institutions. (*Id.* 158:15–25; 159:1). This was especially significant to Klinger because she was the person who drafted the grievance that prompted this lawsuit. (*Id.* 149:4–5). The ability to make an accurate comparison of "OMs" and "ARs" was important to Klinger because it formed the basis for the grievance which alleged, among other things, that female inmates were treated less favorably than male inmates. (*Id.* 149:6–7; 158:15–18.)

**Damages: General Population Inmates**

28. Plaintiffs admit that they have no evidence that "someone missed an appeal deadline or lost their case because of their inability to get into or have adequate assistance in the law library." (D.T. 133:12–14). Plaintiffs have not proven that they suffered any out-of-pocket or other related monetary losses.

29. While Plaintiffs proved that they suffered emotional distress resulting from the inequality in how female inmates were treated as compared to male inmates, Plaintiffs have not persuaded me that such emotional distress was caused in whole or in part by the *Bounds* violation. Rather, I am persuaded that the female inmates suffered emotional distress because of the equal protection violation committed by Gunter and Clarke, a violation that has now been determined, by the court of appeals, not to have been proven. *Klinger II.*

30. Because Plaintiffs, individually and as a class, are unable to show Lofgreen or Tewes caused actual or compensatory dam-

ages, and because this type of case is not the type of case where presumed damages have been recognized, I shall award $1.00 as nominal damages to the general population inmates with respect to the complete and systematic violation of *Bounds* because I am unable to put a dollar value on the harm Plaintiffs suffered. *Hershberger,* 33 F.3d at 956 n. 3; *Reutcke,* 707 F.Supp. at 1136; *Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit* § 4.52 at 74–75.

■ 31. The evidence establishes that neither Lofgreen nor Tewes was recklessly and callously indifferent to the rights of the general population inmates under *Bounds.* Moreover, in the exercise of my discretion, I do not believe that punitive damages are warranted insofar as the general population inmates are concerned.

32. Four examples will serve to illustrate why I do not believe that punitive damages are appropriate:

A. The law librarian testified that plans were made as soon as it was apparent that the law library was overcrowded to move the library and shelves were ordered for that purpose. (D.T. 69:25–71:9). The librarian further testified that it was the delay in receiving the shelving that delayed the eventual move of the law library. (D.T. 70:17–71:3). She also testified that neither Lofgreen nor Tewes were indifferent to this problem. (D.T. 71:4–7).

B. Because he was concerned that the inmates did not know how to use the law library, in the spring of 1988 Lofgreen wrote to various law schools seeking information on correspondence courses which could be offered to NCW inmates to assist them in the use of the law library. (D.T. 75:10–77:6). This activity took place in April of 1988 (D.T. 75:22–76:5), prior to the NCW inmates' July 1988 suit in this case. *Klinger I,* 824 F.Supp. at 1382. This conduct is inconsistent with the assertion that Lofgreen was recklessly and callously indifferent to the legal needs of the inmates.

C. Tewes, who came from the DCS central office, was a temporary superintendent at NCW who served the institution about five months. (D.T. 99:11–16.) He

had no prior experience as a superintendent; in fact, he had never worked in a correctional institution prior to serving as temporary superintendent. (D.T. 99:20–22). Because Lofgreen apparently resigned unexpectedly, Tewes "had no time to become oriented to" the job at NCW, but rather started work the day after Lofgreen left. (*Id.* 100:22–101:3). Tewes also maintained many of his responsibilities at the DCS central office acting as a program director. (*Id.* 100:9–21). Tewes had little time or opportunity to familiarize himself with the problems at NCW, he had no experience in actually running a prison, and he was overworked. Accordingly, the lack of time, experience, and opportunity for orientation suggests that Tewes was not motivated by callous and reckless disregard of the inmates.

D. Within approximately one month after Judge Urbom's adoption of Judge Piester's report and recommendation in *Reutcke* in June of 1988, *Klinger I,* 824 F.Supp. at 1435, inmate Lange was selected by Lofgreen as a potential inmate legal aide and her training was started. (D.T. 53:23–54:8). This relatively quick response by Lofgreen is not indicative of reckless and callous disregard by Lofgreen. While Lange completed her training in September of 1988 when Tewes was the superintendent, she was not appointed as a legal aide until January of 1989. The reasons for this delay, according to the law librarian, were because of various administrative concerns raised by the staff, including "some misconduct reports that Ms. Lange had received." (D.T. 40:12–42:16). While the reasons for the delay are debatable, the explanation by the law librarian is inconsistent with the assertion of reckless and callous indifference on the part of Tewes, particularly given Tewes' lack of experience, lack of orientation to his job, his temporary status, and the fact that he was overworked.

## Liability: Segregation and Orientation Inmates

■ 33. In general, for the time period prior to January, 1989, plaintiffs proved a

systematic and complete violation of *Bounds* regarding segregation and orientation inmates because: (a) no trained and independent inmate legal aide had been appointed; and (b) these inmates had no physical access to the law library. Moreover, for the reasons articulated above, even if these inmates had physical access to the library, Plaintiffs would have nevertheless proven a complete and systematic violation of *Bounds* because there was no trained and independent inmate legal aide, and the law library was not adequate in that it was too small and its collection was disorganized.

 34. To the extent that Defendants seriously argue that the policy of allowing inmates in segregation or orientation to "order" law library books amounted to "some access" to the law library and thus there was no complete and systematic violation of *Bounds,* I reject the argument. If an inmate, who has no access to a trained legal aide, cannot physically go to the law library, the process of "ordering" books from the law library is no substitute for physical access to the library. This is particularly true for prisoners, like the vast majority of NCW inmates, who are poorly educated and untrained in the law. Moreover, this point is even more compelling where, as here, the law library was utterly disorganized.

 35. As the Fourth Circuit said in 1978, "Simply providing a prisoner with books in his cell, if he requests them, gives the prisoner no meaningful chance to explore the legal remedies he might have." *Williams v. Leeke,* 584 F.2d 1336, 1339 (4th Cir.1978), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979). Indeed, it is "unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult." *Id.* Rather, such a policy amounts to a complete and systematic denial of the right of access to the courts. *Reutcke,* 707 F.Supp. at 1132 ("The simple fact is that if the state denies a prisoner direct physical access to a law library, the state must provide that prisoner, no matter what his status, with assistance by trained, skilled, and independent legal personnel.") (citations omitted); *Watson v. Norris,* 729 F.Supp. 581, 585–86 (M.D.Tenn.1989) (Tennessee correc-

tional institution deprived inmates in segregation of their right of access to the courts by prohibiting physical access to prison library when prison policy allowed "jailhouse lawyer" to refuse, in his sole discretion, to help the segregated inmate).

36. *Schrier* cannot fairly be read to require a different conclusion.

### Damages: Segregation and Orientation Inmates

37. For the same reasons earlier stated regarding general population inmates, I award segregation and orientation inmates $1.00 in nominal damages.

38. For the same reasons earlier stated regarding general population inmates, I decline to award compensatory or actual damages, presumed damages, or punitive damages to the segregation and orientation inmates.

### II. Attorney Fees Application

Now that all liability and remedy issues have been resolved, it is necessary to set a schedule for the filing of an application for attorney fees. NELR §§ 54.3 & 83.14 (West 1995). In this regard, the parties have advised me that: (a) all evidence on the issue of whether this case was a catalyst for change regarding attorney fees was presented in the damage phase of trial; (b) all other evidentiary matters regarding attorney fees can be presented by way of affidavit; (c) the plaintiffs should be given approximately 21 days to file their application and affidavits for attorney fees with supporting brief, and the defendants should be given approximately 21 days thereafter to respond; and (d) neither party objects to the court withholding judgment until after resolution of the attorney-fee question.

Accordingly,

IT IS ORDERED that:

1. The motion (Filing 717) styled "Motion to Alter or Amend Findings of Fact and Conclusions of Law" is denied;

2. Plaintiffs are given until November 6th, 1995, to file their application and affidavits for attorney fees with supporting brief,

and Defendants are given until November 27th, 1995, to respond; and

3. Judgment shall be withheld until further order.