Cheryl **KLINGER**, et al., Plaintiffs,

v.

**NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES,**
et al., Defendants.

No. CV88–L–399.

United States District Court,
D. Nebraska.

May 23, 1995.

**1282**

Gail S. Perry & Stephanie F. Stacy, Baylor, Evnen, Curtiss, Grimit & Witt, Lincoln, NE, for plaintiffs.

Don Stenberg, Atty. Gen., Laurie Smith Camp, Deputy Atty. Gen., Lincoln, NE, for defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This case is once again before me to consider Plaintiffs' Rule 54(b) motion (Filing 704). The motion seeks expansion of the non-final liability findings regarding Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 (Title IX), set forth in my opinion in *Klinger v. Nebraska Dep't of Correctional Services*, 824 F.Supp. 1374, 1431–34 (D.Neb.1993) (*Klinger I*), rev'd on equal protection grounds, 31 F.3d 727 (8th Cir.1994) (*Klinger II*), cert. denied, —— U.S.

——, 115 S.Ct. 1177, 130 L.Ed.2d 1130 (1995).

I shall deny the plaintiffs' motion. However, on my own initiative, pursuant to Federal Rule of Civil Procedure 54(b), I will now revise *Klinger I* regarding the previous non-final Title IX liability determination. I do so because I believe that a good-faith application of *Klinger II* destroys the basis for my previous liability finding regarding Title IX even though *Klinger II* explicitly dealt with only a related equal protection question. Stated simply, I reverse myself on the Title IX issue based upon the Court of Appeals' reasoning in *Klinger II*.[1]

## I. BACKGROUND

This case deals with women in prison at the Nebraska Center for Women (NCW), the only prison for women in Nebraska.[2] The women at NCW filed suit, claiming in essence that they were not treated equitably in comparison with their male counterparts at the Nebraska State Penitentiary (NSP) in terms of programs and services.

In order to understand the issues that now confront me, it is necessary to have a clear understanding of both *Klinger I* and *Klinger II*.

### A. *KLINGER I*

As I indicated in *Klinger I*, that opinion dealt with four issues:

(1) Were the female inmates at NCW discriminated against because of their sex in violation of the Equal Protection Clause of the Fourteenth Amendment by a quantitative or qualitative lack of "parity" in pro-

---

1. In so doing, I hasten to add that I respectfully disagree with the majority opinion in *Klinger II*. However, my disagreement is irrelevant. My job as a judge of an inferior court is to fairly apply the precedents of the superior courts, whether I agree with them or not. *See, e.g., Dronenburg v. Zech*, 741 F.2d 1388, 1396 n. 5 (D.C.Cir.1984) (Bork, J.); *Hillhouse v. Harris*, 547 F.Supp. 88, 92–93 (W.D.Ark.1982) (R. Arnold, J., then United States Circuit Judge, now Chief United States Circuit Judge, sitting by designation), aff'd, 715 F.2d 428 (8th Cir.1983).

2. *Klinger II* noted that the State of Nebraska also operated "two institutions that house both men and women...." 31 F.3d at 729. While Ne-

braska operates "coed" correctional "institutions" such as work release centers, the only Nebraska *prison* for women is NCW. (*See, e.g.*, Ex. 348, Administrative Regulation for the Department of Correctional Services (DCS)). The mixed "institutions" that the Court of Appeals referred to "hav[e] no security perimeter enclosure," (Ex. 348 ¶ I E at 3–4 and ¶ II F (Security and Custody Type)), and inmates at these centers are permitted to leave the institutions, even staying overnight with family members at times. *Id.* In fact, in support of an argument *advanced by defendants* I found that evidence of what occurred at these work release centers was irrelevant. *Klinger I*, 824 F.Supp. at 1418.

grams and services as compared to the male inmates at NSP;

(2) Were the female inmates at NCW discriminated against because of their sex in violation of Title IX ... by a quantitative or qualitative lack of "parity" in educational programs receiving federal financial assistance as compared to the male inmates at NSP;

(3) Were the female inmates at NCW denied their right of access to the courts under the Fourteenth Amendment because of the alleged inadequacy of the law library and the alleged lack of trained and independent inmate legal aides at NCW;

(4) Were the female inmates at NCW denied their right to be free from cruel and unusual punishment under the Eighth Amendment because of the alleged deliberate indifference to their serious medical and dental needs.

*Klinger I,* 824 F.Supp. at 1384–85.

After a long bench trial on liability only, I issued a detailed set of findings of fact and conclusions of law with regard to the issue of liability. *Klinger I,* 824 F.Supp. at 1380–1469. I did *not,* however, enter a judgment pursuant to Federal Rule of Civil Procedure 54(b). *Id.* at 1469.

First, with regard to the equal protection claim, I initially found that "the fact remains that female prisoners, as a result of their gender alone, can receive only the programs available at NCW." *Klinger I,* 824 F.Supp. at 1388. I then determined that "heightened scrutiny," rather than "rational basis" scrutiny, should be applied to this policy and the programs which flowed (or did not flow) from this policy.[3] *Id.* I next determined that it was proper to compare the female inmates at NCW with the male inmates at NSP for purposes of determining whether the female inmates were subjected to an equal protection violation because the two groups were

"similarly situated." *Id.* at 1388–1390. Finally, I compared, on a program-by-program basis, the various program offerings (like educational programs) and service offerings (like medical services) at NCW and NSP and concluded that in many (but not all) categories an equal protection violation had been proven when the programs and services were examined by reference to the "heightened scrutiny" standard. *Id.* at 1390–1431.

Secondly, with regard to the Title IX claim that the NCW women had been subjected to discrimination in educational programs receiving federal financial assistance, I initially determined that Title IX applied to prisons. *Id.* at 1431. I then determined that DCS received federal financial assistance in the form of "Perkins Act" funds for operation of its prerelease[4] educational program at all the adult institutions under the control of DCS. I then found that a "violation of Title IX has been established by virtue of my *earlier prerelease equal protection finding.*" *Id.* at 1432 (emphasis added). I also noted that Plaintiffs had argued that other federal funds were received in relation to other programs for which an equal protection violation had been proven, but I declined, "at this point," to pass on these other arguments because the briefing was too sketchy. *Id.* at 1432 n. 103.

Specifically, I found that both NSP and NCW offered prerelease educational programs of comparable quality, but Title IX, like the Equal Protection Clause, was violated because NCW did not offer regularly scheduled prerelease programs while NSP did. *Id.* at 1411–14 & 1432. Also, I found that intentional Title IX discrimination had been proven. *Id.* at 1433–34. For the finding of a Title IX violation, as well as the intentional Title IX violation, I relied, as did the plaintiffs, upon the comparison of NCW to NSP that had been used for the equal

---

**3.** The plaintiffs did not attack the policy as being per se violative of the Constitution, and thus "strict scrutiny" was not an issue. *Id.* at 1385 & n. 9.

**4.** "Prerelease" was a specific program designed to prepare inmates for reentry into society. *Id.*

at 1411–12. I found that an equal protection violation had been established "since January 1, 1989, by the failure of NCW to provide regularly scheduled prerelease programs to its inmates given the fact that NSP inmates were provided with regularly scheduled prerelease programs." *Id.* at 1412.

protection analysis. *Id.* at 1433–34.[5]

Thirdly, in addition to an equal protection violation regarding certain law library issues, *id.* at 1414–17, I also found that the NCW inmates had been denied their Fourteenth Amendment right of access to the courts in two particulars. *Id.* at 1434–38.

Fourth, although I found an equal protection violation regarding certain medical and dental policies, *id.* at 1417–23, I found these inadequacies did not amount to an Eighth Amendment violation. *Id.* at 1438–40.

Fifth, in terms of ultimate liability, I found that: the directors of DCS had liability for the equal protection and Title IX[6] violations, *id.* at 1441–44; the NCW staff had no liability for the equal protection and Title IX violations, *id.* at 1448–49; the directors of DCS did not have liability for the access-to-courts violation, *id.* at 1449–51; and two former superintendents of NCW had liability for the access-to-the-courts violation, *id.* at 1451–52.

## B. *KLINGER II*

I certified three questions to the Court of Appeals pursuant to 28 U.S.C. § 1292(b). *Klinger II*, 31 F.3d at 730. Those questions, summarized, were:

(1) for equal protection purposes, were the inmates at NCW similarly situated to the inmates at NSP?

(2) for equal protection purposes, was "heightened scrutiny" rather than "rational basis scrutiny" properly applied?

(3) for equal protection purposes, did the State of Nebraska have an obligation to provide NCW inmates programs and services which are "substantially equivalent" to the male inmates at NSP?

*Id.*

With one judge dissenting, the Court of Appeals answered that the "NSP inmates are not similarly situated for purposes of prison programs and services." *Id.* Accordingly, the court reversed "the district court's order finding the defendants liable and dismiss[ed] the plaintiffs' equal protection claim." *Id.* The court did not squarely address the other certified questions.

The Court of Appeals was particularly persuaded that the inmates at NSP were not similarly situated to the inmates at NCW because: (1) "NCW houses the fewest inmates"; (2) NSP "houses about six times as many inmates as NCW"; (3) "the average length of inmate stay at NSP is two to three times as long as it is at NCW"; (4) NSP has a higher security level than NCW; and (5) "female inmates as a class have special characteristics distinguishing them from male inmates." *Id.* at 731–32.

The consequence of these differences to the Court of Appeals was two-fold. First, in terms of number of programs, "whether NCW lacks one program that NSP has proves almost nothing." *Id.* at 732. Second, in terms of quality of programs, "there will always be stark differences in programming," and the Constitution does not require "all prisons to have similar program priorities and to allocate resources similarly." *Id.*

In summary, the Court of Appeals held that:

> Differences between challenged programs at the two prisons are virtually irrelevant because so many variables affect the mix of programming that an institution has.... *In short, comparing programs at NSP to those at NCW is like the proverbial comparison of apples to oranges.*

*Id.* at 733.

The *Klinger II* majority then issued a rejoinder, *id.* at 733–734, to the dissent's point that inferiority of programs and services at NCW flowed from the facially non-neutral policy of sending women to one prison and men to a variety of prisons, and thus

---

5. I was also persuaded that the "deliberate indifference" of certain administrators to these differences between NCW and NSP helped to prove intentional discrimination. *Klinger I*, 824 F.Supp. at 1434. If, however, those differences arose in institutions which are not comparable, then the "indifference" of the administrators was, of course, probative of nothing.

6. The State of Nebraska through DCS also had liability for damages on the Title IX violation since Congress had expressly abrogated the immunity of the states. *Id.* at 1434 n. 112.

it was proper to employ the level of scrutiny employed by the district court (heightened scrutiny). *Id.* at 737–739. The majority rejoined that intentional discrimination is what the Constitution seeks to prohibit, and that because there was a facially neutral policy regarding programs, although there was a facially non-neutral policy of assigning women to the one prison for women [7], the district court and the dissent would improperly relieve the plaintiffs of proving intentional discrimination. *Id.* at 733–34.

## II. DISCUSSION

■ Federal Rule of Civil Procedure 54(b) explicitly provides that in the absence of a judgment a "decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties ... is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Because I did not enter a judgment pursuant to Rule 54(b) and since the trial was bifurcated between liability and remedy, I therefore have the power to revise *Klinger I* pursuant to Rule 54(b).

Plaintiffs assert that I should revise *Klinger I* to expand my opinion on Title IX so as to treat virtually all of the equal protection violations as Title IX violations. After care-

ful thought, I do not believe I should do so. Indeed, I now believe that I must reverse, rather than amplify, my previous decision regarding Title IX. I am so persuaded because *Klinger II* destroys the probative force of the evidence—comparative inequality between NSP and NCW—that I relied upon to find not only Equal Protection Clause violations, but also the Title IX violation.

### A.

Title IX prohibits sex discrimination in educational programs receiving federal assistance:

> No person in the United States shall, *on the basis of sex,* be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance....

20 U.S.C. § 1681(a) (emphasis added).

When the alleged lack of, or inferiority in, prison educational programs has been challenged under Title IX, the few courts that have found violations of Title IX have been presented, as a predicate to liability, with a comparison of either (a) *all* prisons in the system, *see, e.g., Jeldness v. Pearce,* 30 F.3d 1220, 1222 (9th Cir.1994) (comparing all adult Oregon prisons); *Canterino v. Wilson,* 546 F.Supp. 174, 191–92 (W.D.Ky.1982) (compar-

---

**7.** With sincere respect for the *Klinger II* majority, this distinction seems very weak to me. It is precisely like the old argument that was used to uphold policies that previously prevailed in our public schools which proclaimed that all children are entitled to an equal education, but African–American children are only entitled to the education they receive at all-black schools which they are required to attend because of their race. While the first policy is facially neutral, the second and operative policy is not. Moreover, if the majority was looking for written policies that explicitly tied programs to gender, the record contained such polices. (*See, e.g.,* Ex. 348 (this regulation of DCS defines security type, custody type, inmate type and program offerings at all adult institutions)). Insofar as NCW is concerned, this regulation makes a "permanent assignment" of "all adult female[s]" to NCW and then lists the programs that are available to them at NCW. (Ex. 348 ¶ II A at 4–5.) Pursuant to that regulation, the programs offered to NCW are *explicitly* different than the programs offered to the men at NSP (and elsewhere). (*Compare* Ex. 348 ¶ II A at 5 (NCW programs) *with* ¶ II B at 5 (NSP programs)). The purpose of Exhibit 348

was to assign inmates to "appropriately designated security level institutions or facilities," not only to maintain "control," but also to "provide opportunities for productivity, growth and development of the individual inmate." (*Id.* (Purpose)). As a consequence, I continue to convinced that I was confronted with a non-neutral policy which tied programs and services to gender and accordingly required the type of scrutiny set forth in such cases as *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 731, 102 S.Ct. 3331, 3340, 73 L.Ed.2d 1090 (1982). But, no matter what the proper level of scrutiny, it is a different question as to whether NSP and NCW are sufficiently comparable that it makes sense to draw inferences from a comparison between the two institutions. Accordingly, the rejoinder in *Klinger II* ought not be confused with the basic holding of *Klinger II* that NCW and NSP were not comparable. *Compare Pargo v. Elliott,* 49 F.3d 1355 (8th Cir.1995) (reversing the district court's reliance upon *Klinger II,* reading *Klinger II* to be limited to the "similarly situated" holding, and recognizing that traditional heightened scrutiny of gender-driven policies may apply in the prison context in the proper circumstance.)

ing all adult Kentucky prisons), *vacated on other grounds*, 869 F.2d 948 (6th Cir.1989), or (b) a comparison between *similarly situated* prisons. *See Women Prisoners of Dist. of Columbia Dep't of Corrections v. District of Columbia*, 877 F.Supp. 634, 675–78 (D.D.C.1994) (comparing "similarly situated" women at Lorton Minimum Security Annex with "similarly situated" males at the Minimum Facility, and "similarly situated" women at the Correctional Treatment Facility with "similarly situated males" at the Occoquan, Central, and Medium facilities; court found groups "similarly situated" on basis of similar custody levels, sentence structures, and purposes of incarceration).

■ Even when the courts have infrequently found a Title IX violation given comparisons between *all* prisons or *similarly situated* prisons, the courts have also been quick to caution that: "Prisons are different from other institutions to which Title IX applies. Security is an important concern. And sex segregation is the accepted norm." *Jeldness*, 30 F.3d at 1228.

Indeed, under the expansive interpretation of Title IX set forth in *Jeldness* where *all* Oregon prisons were examined, Title IX was *not* interpreted to "require gender-integrated classes in prisons," *id.* at 1228, or to require "[s]trict one-for-one identity of classes," *id.* at 1229, or to require "as many classes in a small women's prison as in the larger men's prisons." *Id.* In fact, the *Jeldness* court made clear that under Title IX the "programs need not be identical in number or content...." *Id.*

■ Thus, one cannot draw the conclusion that differences in treatment occur "on the basis of sex" as proscribed by Title IX simply by proving that male inmates are treated differently, or even better, than female inmates in some educational circumstances. For if that conclusion could properly be drawn, then Title IX would require that male and female prisoners receive virtually identical treatment under all circumstances, regardless of the fact that "[p]risons are different from other institutions to which Ti-

tle IX applies," regardless of the fact that "[s]ecurity is an important concern," and regardless of the fact that "sex segregation is the accepted norm." *Jeldness*, 30 F.3d at 1228. No case has ever interpreted Title IX in such a fashion.

An example drawn from this case will illustrate the point. In this case, Plaintiffs chose [8] to offer evidence limited almost exclusively to NSP. I found in *Klinger I* that both NSP and NCW offered prerelease educational programs of comparable quality, but Title IX, like the Equal Protection Clause, was violated because NCW did not offer regularly scheduled prerelease programs while NSP did. *Klinger I*, 824 F.Supp. at 1411–14 & 1432. Both of these findings were premised upon my determination, later explicitly reversed by *Klinger II*, that one could profitably compare NSP with NCW.

■ If NSP is not comparable, then the absence of regularly scheduled prerelease programs at NCW proves virtually nothing. Absent comparability between the institutions, differences in the scheduling of prerelease programs at NSP and NCW may, for example, simply be a function of NCW having a small number of inmates whose time in prison is relatively short, thus impeding for non-gender-related reasons regularity in scheduling. If per capita funding is not discriminatory, if NSP is not comparable and if there is little or no evidence, as is this case here, about how male inmates, in smaller all-male prisons, with short sentence lengths, are accorded prerelease programs, the court simply lacks *any* persuasive evidence upon which a conclusion can be predicated that the lack of regularly scheduled prerelease programs at NCW occurs on the "basis of sex," as Title IX explicitly requires.

Because the Court of Appeals has held *as a matter of law* that "*comparing programs at NSP to those at NCW is like the proverbial comparison of apples to oranges,*" *Klinger II*, 31 F.3d at 733, the evidence in this case, when reexamined in light of *Klinger II*, fails to establish a Title IX violation. This is

---

**8.** *Klinger II*, 31 F.3d at 729 (recognizing that plaintiffs limited their comparison group to NSP, and then belatedly and unsuccessfully tried to

expand the comparison group to all male inmates). *See also Klinger I*, 824 F.Supp. at 1384 n. 6 & 1388 n. 14.

specifically true because (1) the evidence of discrimination, intentional or otherwise, and whether viewed in light of the Equal Protection Clause or Title IX, is largely (if not totally) dependent upon a factual comparison of NSP with NCW to the exclusion of all other Nebraska prisons, *Klinger II*, 31 F.3d at 729; *Klinger I*, 824 F.Supp. at 1384 n. 6 & 1388 n. 14; and (2) Plaintiffs do not claim that the allegedly inferior programs at NCW result from discriminatory funding, since Nebraska spends more money per capita at NCW than at any other adult prison in its system. *Klinger II*, 31 F.3d at 731 n. 2; *Klinger I*, 824 F.Supp. at 1392–93.

■ In sum, if NSP is not *factually* comparable to NCW, then "[d]ifferences between challenged programs at the two prisons are virtually irrelevant because so many variables affect the mix of programming that an institution has." *Klinger II*, 31 F.3d at 733. Therefore, since the plaintiffs have presented no other relevant or persuasive evidence tending to prove a Title IX violation, it follows that the plaintiffs have failed in their burden to prove that the NCW women were denied educational opportunities in violation of Title IX "on the basis of sex."

### B.

Pursuant to Fed.R.Civ.P. 52(a) I find and conclude that Plaintiffs have failed to prove a violation of Title IX. Specifically, I find and conclude that there is no relevant or persuasive evidence that the women at NCW have been excluded from, denied the benefits of, or subjected to discrimination regarding programs or services "on the basis of sex." Therefore, pursuant to Fed.R.Civ.P. 54(b), the contrary findings and conclusions expressed in *Klinger I*, 824 F.Supp. at 1431–34, 1463–64 (findings and conclusions numbered 134–143), and 1466–67 (findings and conclusions numbered 171–178 to the extent related to Title IX) should be stricken.

Accordingly,

IT IS ORDERED that:

1. Plaintiffs' Rule 54(b) motion (Filing 704) is denied;

2. Pursuant to Fed.R.Civ.P. 52(a), the court finds and concludes that Plaintiffs have failed to prove a violation of Title IX, as there is no relevant or persuasive evidence that the women at NCW have been excluded from, denied the benefits of, or subjected to discrimination regarding programs, or services "on the basis of sex";

3. Pursuant to Fed.R.Civ.P. 54(b), the contrary findings and conclusions expressed in *Klinger I*, 824 F.Supp. at 1431–34, 1463–64 (findings and conclusions numbered 134–143), and 1466–67 (findings and conclusions numbered 171–178 to the extent related to Title IX) are stricken;

4. Counsel for the parties are ordered to appear at a status conference in the chambers of the undersigned on the 5th day of June, 1995, at 12:00 noon;

5. Judgement is withheld.