Cheryl KLINGER, et al., Plaintiffs,

v.

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES, et al., Defendants.

No. 4:CV88–L–399.

United States District Court, D. Nebraska.

Dec. 15, 1995.

Gail S. Perry and Stephanie F. Stacy, Baylor, Evnen, Curtiss, Grimit & Witt, Lincoln, NE, for plaintiffs.

Don Stenberg, Attorney General, Laurie Smith Camp, Deputy Attorney General, Lincoln, NE, for defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

Pending before the court is Plaintiffs' application for attorney fees and expenses (filing 723), in support of which Plaintiffs have filed numerous affidavits and exhibits (filing 724). After consideration of Plaintiffs' application and supporting evidence and Defendants' response thereto, I shall award Plaintiffs $37,084.92 in attorney fees and $3,557.52 in expenses.

## I. BACKGROUND

### A. *Procedural History*

This case involved female inmates at the Nebraska Center for Women (NCW) who filed suit claiming inequitable treatment in programs and services as compared with male inmates at the Nebraska State Penitentiary (NSP). After a month-long trial, I issued an opinion, *Klinger v. Nebraska Dep't of Correctional Services*, 824 F.Supp. 1374

(D.Neb.1993) (*Klinger I* ), which found: (1) when examined by reference to the "heightened scrutiny" standard, female inmates at NCW were discriminated against because of their sex in many (but not all) program and service offerings as compared to male inmates at NSP, in violation of the Equal Protection Clause of the Fourteenth Amendment, *id.* at 1390–1431; (2) based upon the same NCW/NSP comparison which had been used for the equal protection analysis, Plaintiffs established a violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 (Title IX), because NCW did not offer regularly scheduled prerelease programs while NSP did, *id.* at 1431–1434; (3) the segregation and orientation inmates at NCW were completely and systematically denied their right of access to the courts under the Fourteenth Amendment until January, 1989, because those inmates had no physical access to the law library or assistance from a trained legal aide, and NCW general population inmates were completely and systematically denied the same right prior to January, 1989, because those inmates did not have access to a trained legal aide and the law library itself was not adequate, *id.* at 1434–1438; and (4) NCW's medical and dental policies did not amount to an Eighth Amendment violation, *id.* at 1438–1440.

On interlocutory appeal pursuant to 28 U.S.C. § 1292(b), the Eighth Circuit Court of Appeals concluded that the plaintiffs, NCW inmates, were not similarly situated to male inmates at NSP for purposes of prison programs and services; reversed *Klinger I* insofar as it found Defendants liable for violating Plaintiffs' equal protection rights; and dismissed Plaintiffs' equal protection claim. *Klinger v. Department of Corrections,* 31 F.3d 727, 729 & 731 (8th Cir.1994) (*Klinger II* ). Plaintiffs' petition for writ of certiorari was denied in *Klinger v. Nebraska Dep't of Corrections,* — U.S. —, 115 S.Ct. 1177, 130 L.Ed.2d 1130 (1995).

Because judgment had not yet been entered and trial had been bifurcated between liability and remedy, I revised *Klinger I* pursuant to Fed.R.Civ.P. 54(b) in *Klinger v. Nebraska Dep't of Correctional Services,* 887 F.Supp. 1281 (D.Neb.1995) (*Klinger III* ). In *Klinger III,* I reversed my decision regarding Title IX in *Klinger I* because my Title IX findings in *Klinger I* were premised upon my determination that one could profitably compare NSP with NCW, a determination explicitly reversed by the Eighth Circuit in *Klinger II.* Thus, I concluded in *Klinger III* that Plaintiffs failed to prove that NCW inmates were denied educational opportunities on the basis of sex, in violation of Title IX. *Klinger III,* 887 F.Supp. at 1287.

After a bench trial on the issue of damages regarding my previous finding that former NCW superintendents Victor Lofgreen and Larry Tewes were liable for the above-described access-to-the-courts violations, *Klinger I* at 1383 & 1452, I issued an opinion in *Klinger v. Nebraska Dep't of Correctional Services,* 902 F.Supp. 1036 (D.Neb.1995) (*Klinger IV* ). I awarded $1.00 in nominal damages to the NCW general population inmates, recognizing that Plaintiffs were unable to show that Lofgreen and Tewes caused actual or compensatory damages, that presumed damages have not been recognized in this type of case, that a dollar value could not be assigned to the harm Plaintiffs suffered, and that punitive damages were not warranted. *Id.,* at 1043–44. I also awarded $1.00 in nominal damages to the NCW segregation and orientation inmates, again declining to award compensatory, actual, presumed, and punitive damages. *Id.,* at 1045–46. I further ordered the filing of the application for attorney fees, which is the matter now before me.

### B. Application for Attorney Fees and Expenses

Plaintiffs' application for attorney fees and expenses (filing 723) requests a base lodestar attorney fee of $529,784.50 and $50,821.71 in expenses. The application is supported by the following evidentiary materials: affidavit of Robert T. Grimit and exhibit; affidavit of Gail S. Perry and attached exhibits; affidavit of Stephanie F. Stacy; affidavit of David A. Dudley; affidavit of Susan L. Blackwell and attached exhibits; affidavit of Victor E. Covalt, III; affidavit of David R. Buntain; and

affidavit of Vincent Powers.[1]

## 1. Request for Attorney Fees

Plaintiffs' request for attorney fees in the amount of $529,784.50 was calculated by Plaintiffs' lawyers in the following manner.

Total time billed to this case by lawyers, law clerks, paralegals, and support staff—some 45 individuals—from October 18, 1988, to October 31, 1995, was 9,591.6 hours. (Blackwell Aff. ¶ 12(A) & Ex. K.) This sum was voluntarily reduced twice. First, the sum was reduced by 1,098 hours to delete the work of non-primary timekeepers, such as lawyers who only worked sporadically on the case or clerical personnel. (Blackwell Aff. ¶¶ 10 & 12(A)–(B) & Exs. K, L.) While the time appearing on billing statements for all primary timekeepers[2] was 8,493.6 (Blackwell Aff., Ex. L), this amount was reduced to 5,123.6 after the time entries for primary timekeepers were divided into categories of 10 core legal activities such as document discovery, discovery disputes, settlement negotiations, depositions, and motions/briefs. (Perry Aff. ¶ 22; Blackwell Aff. ¶¶ 11 & Exs. A–J.) This reduction accounted for duplication and removal from consideration of time spent on appeal (350.2 hours). (Blackwell Aff., Ex. M.) Time for telephone calls (216 hours), correspondence (177.4 hours), and time spent on preparation of the fee application (214.5 hours) was also excluded from this initial hourly figure. (Blackwell Aff. ¶¶ 15, 16, 17 & Exs. M, S.)

The "lodestar" was then determined by taking 5,123.6 hours for the 10 core legal activities accomplished by the primary timekeepers (Blackwell Aff., Ex. L) and adding 216 hours for telephone calls, 177.4 hours for correspondence, and 214.5 hours for preparation of the fee application. (Blackwell Aff. ¶¶ 15, 16, 17 & Exs. M, S.) The total number of hours claimed to have been reasonably expended on this case was 5,731.5.

For all tasks except telephone calls and correspondence, the hourly billing rate for each primary timekeeper was then multiplied by the number of hours spent for that timekeeper. (Blackwell Aff., Exs. M, S.) These rates ranged from $150.00 per hour to $90.00 per hour for lawyers, $50.00 per hour for the paralegal, and $35.00 per hour for the law clerks. (*Id.*) An average hourly billing rate for all primary timekeepers of $105.00 per hour was multiplied by telephone and correspondence hours. (Blackwell Aff. ¶¶ 15, 16.)

The total lodestar fee was thus calculated at $529,784.50 for 5,731.5 hours. (Blackwell Aff., Ex. M.) This figure represents all work which counsel claim was reasonably done on the case, excluding appeals. This figure does not represent work on the successful access-to-the-courts claim only, as counsel argue they cannot break out the work done on the successful claim only because the claims were so interrelated. (Perry Aff. ¶¶ 25–28.) However, counsel make a "rough estimate" that 20 percent of their time was spent on the successful claim and closely related issues. (Perry Aff. ¶ 29.)

## 2. Request for Expenses

Plaintiffs also request $50,821.71 in expenses. This figure was calculated by dividing the entire original computerized billing statement (Blackwell Aff., Ex. P, at 397–472; summarized at Ex. Q) into seven general categories—collect calls from inmates, long distance charges, photocopying, express mail, postage, Westlaw research, and deposition expenses. (Blackwell Aff., Ex. Q.) Telecopier expenses were not included, nor were other expenses not fitting into the above seven categories. (*Compare* Blackwell Aff., Ex. P, at 397–472, *with* Ex. Q.) The firm's customary 20–cents–per–page charge for photocopying was reduced to 5 cents per copy, and the firm's usual markup for Westlaw research expenses was not applied. (Blackwell Aff. ¶ 14.) The total figure reached for expenses in these seven catego-

---

1. All affidavits and exhibits from these individuals are part of Filing 724, but this filing number will not be repeated for ease of citation.

2. Primary timekeepers were senior partner Robert T. Grimit; partner Gail S. Perry; partner David A. Dudley; associate Stephanie F. Stacy, who worked initially on the case as a law clerk; paralegal Susan L. Blackwell; and law clerk Kirsten Gregory. (Perry Aff. ¶ 6.)

ries was $21,160.03, to which was added Plaintiffs' expenses which formed the basis for their reimbursement from the Federal Practice Fund—expenses which must be repaid in the event expenses are awarded in this court. (Perry Aff. ¶ 30; Blackwell Aff., Ex. Q, at 3.) Plaintiffs calculate these Federal Practice Fund expenses as $29,661.68. (Blackwell Aff., Ex. Q, at 3 (subtracting expenses in seven categories from total expenses requested); Ex. R (orders by Chief Judge Lyle E. Strom authorizing disbursement of $29,161.68 and $500 from Federal Practice Fund).)

## II. ANALYSIS

### A. Prevailing Party

■ This court has discretion to allow the "prevailing party" in this lawsuit a reasonable attorney fee as part of the costs. 42 U.S.C. § 1988(b).

> [T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim.... [A] plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.
>
> . . . .
>
> A judgment for damages in any amount, whether compensatory or nominal, modifies the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay.

*Farrar v. Hobby*, 506 U.S. 103, 111–13, 113 S.Ct. 566, 573–74, 121 L.Ed.2d 494 (1992). Because "the prevailing party inquiry does not turn on the magnitude of relief obtained," *id.* at 114, 113 S.Ct. at 574, it follows that "a plaintiff who wins nominal damages is a prevailing party under § 1988." *Id.* at 112, 113 S.Ct. at 573. *See also Milton v. Des Moines, Iowa*, 47 F.3d 944, 945 (8th Cir.), *cert. denied sub nom., Milton v. Heller*, — U.S. —, 116 S.Ct. 87, 133 L.Ed.2d 44 (1995); *Casey v. City of Cabool*, 12 F.3d 799, 804 (8th Cir. 1993), *cert. denied*, — U.S. —, 115 S.Ct. 325, 130 L.Ed.2d 285 (1994).

Therefore, Plaintiffs' $2.00 award in nominal damages for access-to-the-courts violations makes Plaintiffs prevailing parties for purposes of 42 U.S.C. § 1988.

### B. Nominal Damage Award as Technical or De Minimis

■ Despite the fact a plaintiff may be a prevailing party, when a plaintiff's success is "purely technical or *de minimis*, no fees can be awarded." *Farrar v. Hobby*, 506 U.S. at 116, 113 S.Ct. at 576 (O'Connor, J., concurring). The relevant indicia of success are: (1) the extent of relief achieved as measured by the difference between the amount recovered and the damages sought; (2) the significance of the legal issue on which the plaintiff prevailed; and (3) the public purpose or goal the litigation might have served. *Id.* at 120–23, 113 S.Ct. at 578–79 (O'Connor, J., concurring). *See also Jones v. Lockhart*, 29 F.3d 422, 423–24 (8th Cir.1994) (applying O'Connor factors in *Farrar* to prisoner civil rights case where Plaintiff alleged three Eighth Amendment claims and recovered $2.00 on one of the claims, with defendants prevailing on all other claims; court found Plaintiff's victory "though minimally compensated, was not pyrrhic or technical."). Applying these factors to the present case, I conclude that Plaintiffs' success is not technical or *de minimis*.

#### 1. Difference Between Recovery and Relief Sought

First, I cannot say that the difference between the amount recovered, $2.00, and damages sought was dramatic because Plaintiffs simply requested an award of "compensatory and punitive damages." (Filing 333, at 19 (Pls.' Third Am. Compl.).) *Compare Farrar*, 506 U.S. at 121, 113 S.Ct. at 578 (O'Connor, J., concurring) (17 million dollars sought; one dollar recovered).

#### 2. Significance of Legal Issue

Second, like the court in *Jones v. Lockhart*, 29 F.3d at 424, I find that vindication of the "fundamental constitutional right of access to the courts," *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72

(1977), is "a significant legal issue in contrast to the injury to a business interest alleged in *Farrar*." [3] Access to the courts has been described as "perhaps the most cherished of all constitutional guarantees" because without such access "none of the other rights which the Constitution guarantees would be secure." *Vaughn v. Trotter*, 516 F.Supp. 886, 900 (M.D.Tenn.1980). Thus, Plaintiffs' victory on their access-to-the-courts claim involved enforcement of the one fundamental constitutional right which is pivotal to the enforcement of all other rights, and is therefore a victory on a significant legal issue.

### 3. Public Purpose or Goal Served by Litigation

 Finally, this particular litigation served a public goal or purpose, as does civil rights litigation in general.

A plaintiff bringing a civil rights action "does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority."

*Jones v. Lockhart*, 29 F.3d 422, 424 (8th Cir.1994) (quoting *Casey v. City of Cabool*, 12 F.3d 799, 805 (8th Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 325, 130 L.Ed.2d 285 (1994) (quoting *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966–67, 19 L.Ed.2d 1263 (1968))).

 The content of Plaintiffs' access-to-the-courts claim suggests that Plaintiffs' main goal with respect to this claim was to remedy the inadequate law library at NCW, correct the legal-aide situation, and change Defendants' unconstitutional policies. During the course of this litigation, that goal has been achieved. (Br. Supp. Pls.' Appl. Attorney Fees & Expenses, App. A (timeline indicating corrective measures taken at NCW, as established by evidence, during course of this litigation).) "The chronological sequence of events is an important factor in determining whether or not it can be inferred that the defendants guided their actions in response to plaintiffs' lawsuit." *United Handicapped*

*Federation v. Andre*, 622 F.2d 342, 347 (8th Cir.1980) (noting that even though defendants made some efforts in addressing the alleged discrimination prior to the filing of the plaintiffs' lawsuit, certain events took place after filing suit and efforts to address the discrimination increased sharply after suit was filed).

The chronological events in this case lead to an inference, *id.*, that Defendants guided their actions with respect to the NCW library in response to Plaintiffs' lawsuit. As the "law library" timeline and overlay of Appendix A indicates, a number of pivotal changes regarding Plaintiffs' access-to-the-courts claim coincide with identifiable events in this litigation. For instance, shortly after counsel was appointed (October 1988), the inmate legal aide position was filled (January 1989) and the law library was moved and inventoried. One month before the first scheduled trial date (December 1989), NCW segregation and orientation inmates were given direct physical access to the law library, and the law library materials were expanded to include the Shepard's citator. One month before the third scheduled trial date (November 1990), the NCW law library materials were expanded yet again to include the Federal Shepard's citator. (Br. Supp. Pls.' Appl. Attorney Fees & Expenses, App. A ("Law Library" timeline with "Case Progression" overlay and references to exhibits in evidence indicating corrective measures taken at NCW, as established by evidence, during course of this litigation).)

Based on this chronology, it is clear that this litigation served a public goal or purpose by ensuring that the NCW law library complies with *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977), and that NCW policies provide for adequate access to the courts.

### 4. Conclusion Regarding Victory as Technical

Therefore, under the O'Connor test set forth in *Farrar* and adopted by the Eighth

---

**3.** *Farrar* involved coadministrators of decedent Farrar's estate who sought from Texas officials $17 million in compensatory damages pursuant to 42 U.S.C. §§ 1983 and 1985 for the alleged illegal closure of a school that Farrar and his son operated. *Farrar v. Hobby*, 506 U.S. at 105–06, 113 S.Ct. at 570.

Circuit Court of Appeals, *Jones v. Lockhart,* 29 F.3d 422 (8th Cir.1994), Plaintiffs' victory in this case was neither technical nor *de minimis,* entitling Plaintiffs to an award of attorney fees and expenses under 42 U.S.C. § 1988.

## C. The Lodestar

 In what has come to be known as the "lodestar," a reasonable attorney fee in § 1988 cases is the number of hours reasonably expended on the lawsuit, multiplied by a reasonable hourly rate. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Courts are to look to the marketplace as a guide in determining what is a "reasonable" attorney fee. *Missouri v. Jenkins,* 491 U.S. 274, 285, 109 S.Ct. 2463, 2470, 105 L.Ed.2d 229 (1989); *Blum v. Stenson,* 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984) (reasonableness of requested rates is to be determined with reference to rates prevailing in the community for similar services by attorneys of comparable skill, experience, and reputation).

 Subsumed within the lodestar calculation are the *"Johnson* factors," derived from *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974). *Hensley v. Eckerhart,* 461 U.S. at 429–30 & 434 n. 9, 103 S.Ct. at 1937–38 & 1940 n. 9 (referring to *Johnson* factors, and noting that "many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate").[4]

I now turn to calculation of the lodestar, specifically taking into account the *Johnson* factors.[5]

## 1. Calculation of Reasonable Hourly Rate

### a. Customary Fees

 Plaintiffs' counsel's hourly billing rate for this litigation and other civil matters of similar size and complexity are as follows:

| | |
|---|---|
| Robert T. Grimit | $150.00 |
| Gail S. Perry | $120.00 |
| David A. Dudley | $100.00 |
| Stephanie F. Stacy | $ 90.00 |

(Grimit Aff. ¶¶ 4, 7; Perry Aff. ¶¶ 5, 9.) Further, because it is the practice in the relevant market to bill clients for the services of paralegals and law clerks, counsel have set forth the following billing rates for those individuals in this and similar litigation:

| | |
|---|---|
| Paralegals | $ 50.00 |
| Law Clerks | $ 35.00 |

*See Missouri v. Jenkins,* 491 U.S. 274, 286–88, 109 S.Ct. 2463, 2470–72, 105 L.Ed.2d 229 (1989) (if practice in relevant market is to bill work of paralegals separately, that is what § 1988 requires). (Perry Aff. ¶¶ 5, 11; Covalt Aff. ¶ 7.)

As evidenced by the affidavits submitted in this matter, these rates are well within the range of reasonableness for complex civil rights litigation in the Lincoln, Nebraska, area for attorneys with similar skill, experience, and ability. (Buntain Aff. ¶ 6; Covalt Aff. ¶ 6.)

### b. Skill, Experience, Reputation, and Ability of Counsel

The skill, experience, reputation, and ability of counsel in this case are outstanding. Robert T. Grimit has practiced law since 1964 and is a partner at the law firm of Baylor, Evnen, Curtiss, Grimit & Witt in Lincoln, Nebraska. Mr. Grimit has been

---

**4.** *"Hensley* makes clear that [the *Johnson* factors] matter only as they bear on the market rate or hours reasonably expended, or, in rare cases, if they are a basis for adjusting the lodestar." Alan Hirsch & Diane Sheehey, *Awarding Attorneys' Fees and Managing Fee Litigation* at 19 n. 84 (Federal Judicial Center 1994). In reaching my decision, I have considered each and every *Johnson* factor. These factors are: (1) time and labor required; (2) novelty and difficulty of issues; (3) skill required; (4) loss of other employment; (5) customary fee; (6) whether fee is fixed or contingent; (7) time limitations imposed by client or circumstances; (8) amount involved and results

obtained; (9) counsel's experience, reputation, and ability; (10) undesirability of case; (11) nature and length of relationship with clients; and (12) awards in similar cases. *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d at 717–19.

**5.** The sixth *Johnson* factor, whether the fee is fixed or contingent, will not be considered since there was no fee agreement between Plaintiffs and counsel because counsel was appointed by the court. (Br. Supp. Pls.' Appl. for Attorney Fees & Expenses at 16.)

involved in various types of complex litigation, including civil rights litigation, and has practiced extensively in state and federal courts. (Grimit Aff. ¶ 2.) Mr. Grimit was actively involved in civil rights litigation for a number of years, and is now serving in an advisory and consultative capacity in such cases. (Grimit Aff. ¶ 2.) Among numerous other professional affiliations and special distinctions, Mr. Grimit has held several executive positions in the Nebraska State Bar Association, including president, and is also a Fellow of the American Bar Foundation. (Grimit Aff., Ex. A.)

Gail S. Perry, also a partner in the Baylor law firm, is rated "AV" by Martindale–Hubbell and is an active participant in the Nebraska State Bar Association, including election to a second term in the NSBA House of Delegates commencing in 1995. Ms. Perry also serves on the Federal Practice Committee for the District of Nebraska. (Perry Aff. ¶ 2.) Ms. Perry's special distinctions include membership in Phi Beta Kappa; authoring several articles dealing with law and psychology; serving as chair of the Allen Moot Court Board at the University of Nebraska College of Law; and serving as judicial law clerk for United States Magistrate David L. Piester, where Ms. Perry gained substantial experience with inmate civil rights litigation. (Perry Aff., Ex. A & ¶ 3.) Ms. Perry has performed civil rights defense work throughout her legal career, and since becoming partner of her law firm in 1992, approximately one-third of Ms. Perry's work has consisted of such work (excluding time spent in the *Klinger* matter). (Perry Aff. ¶ 3.)

David A. Dudley is a partner of the Baylor law firm, and is rated "BV" by Martindale–Hubbell. (Dudley Aff. ¶¶ 1–2.) Mr. Dudley graduated from the University of Nebraska College of Law with distinction, and while in law school was a member of the Allen Moot Court Board; Order of the Barristers, a national oral advocacy honorary; and the National Moot Court Team. (Dudley Aff., Ex. A.)

Stephanie F. Stacy is now an associate with the Baylor law firm after having served as a law clerk for the firm while in law school at the University of Nebraska College of Law. (Stacy Aff. ¶ 1.) Ms. Stacy graduated from the College of Law with distinction and as a member of the Order of the Coif. While in law school, Ms. Stacy was a member of the Nebraska Law Review, the Allen Moot Court Board, and the National Moot Court Team; received American Jurisprudence Awards in four courses, among them Criminal Trial and Postconviction Procedure; and wrote a law review comment which was selected for publication. (Stacy Aff. ¶ 2.) Like Ms. Perry, Ms. Stacy served as a law clerk for United States Magistrate David L. Piester for two years, during which she had intensive contact and involvement with inmate civil rights suits in federal court. (Stacy Aff. ¶ 3.)

Counsel's reputation in the legal community for quality of work is excellent. (Buntain Aff. ¶ 4 ("Robert T. Grimit and Gail S. Perry ... [are] very capable, skilled and accomplished trial attorneys"); Covalt Aff. ¶ 4 ("Robert T. Grimit, Gail S. Perry and David A. Dudley ... [are] excellent trial attorneys").)

Counsel's performance in this particular case has been as superb as each attorney's credentials. As I have previously noted, "[a]ppointed counsels' service was of the very highest caliber." *Klinger v. Nebraska Dep't of Correctional Services*, 824 F.Supp. at 1382 n. 4.

### c. Awards in Similar Cases

While the requested hourly rates for David A. Dudley ($100) and Stephanie F. Stacy ($90) are well within the range customarily awarded by this court in civil rights litigation, and while the requested hourly rates for paralegals ($50) and law clerks ($35) are actually lower than that allowed for similar work in other civil rights cases, *Tabech v. Gunter*, 869 F.Supp. 1446, 1456 & 1461 (D.Neb.1994) (attorney rate of $85–$105 per hour in civil rights cases of the type involved in that case was reasonable; $55 allowed for paralegal and $45 for law clerk), the hourly rates claimed for attorneys Robert Grimit ($150) and Gail Perry ($120) are outside this range.

While the $85.00–$105.00 range may be reasonable for most civil rights cases, I believe the extraordinary nature of this case, as

well as the preeminence of the attorneys involved in this litigation, justify the higher rates of Mr. Grimit and Ms. Perry. This case was an extremely broad, unusually complex, institution-wide challenge to the constitutionality of NCW programs and services— a case which was made even more extraordinary by the behavior of former defense counsel.

> Unfortunately, prior to the involvement in the case of Elaine Chapman and Laurie Smith Camp, counsel for the defense, this matter was often one of the most unpleasant cases in which I have ever been involved. In my professional opinion, during the time I have been engaged in the practice of law in Lincoln, Nebraska, our firm and its attorneys have never been treated worse by opposing counsel.

(Grimit Aff. ¶ 10; *see also* Perry Aff. ¶ 23 (describing former defense counsel's conduct as "zealous representation without a purpose" which was "a major distraction in this case and personally stressful").)

Adding to the extraordinary nature of the case was the four-week trial, including some weekends; the management of voluminous exhibits; and the orchestration of numerous inmate and corrections witnesses who required extreme flexibility in a not-so-flexible court schedule. (Perry Aff. ¶ 13 & Ex. A ("I can only describe it as ferocious, beyond any litigation I have observed, heard of, or been involved in [in] my [12-year legal] career").)

#### d. Nature and Length of Relationship with Clients

Counsel in *Klinger* were appointed in 1988 and continue in 1995 to serve in that capacity, a time period which equals what this court termed an "extraordinary" length of representation in *Tabech v. Gunter*, 869 F.Supp. 1446, 1458 (D.Neb.1994) (counsel appointed in 1987 to serve a large and diverse group of prison inmates for seven years; nature and length of representation should be considered extraordinary in terms of responsibility to a large number of plaintiffs and the sheer duration of the case).

#### e. Undesirability of Case

Plaintiffs' counsel's appointment to this case is not one envied by other private attorneys (Powers Aff. ¶ 7; commenting on time required in such cases and fact that compensation given does not reflect inherent risks and loss of business) because prisoners can make unsympathetic plaintiffs and difficult clients, and the time required to ferret out potential claims, conduct discovery, and present such cases in trial is extraordinary (Covalt Aff. ¶ 2). Many of counsel's regular clients reacted adversely to the Baylor firm's vigorous representation of the Plaintiff inmates in this case; and the enormity of this case had a significant adverse impact on counsel's firm in terms of total time expended and the cash flow required to pursue the case. (Grimit Aff. ¶ 8.) Also added to the undesirability of the case were counsel's time-consuming and unpleasant disputes with former defense counsel, as discussed above. (Grimit Aff. ¶ 10; Perry Aff. ¶ 23.)

#### f. Loss of Other Employment

The affidavits submitted by Plaintiffs' counsel demonstrate that the time commitment involved in representing Plaintiffs in this complex litigation served to seriously reduce the amount of time Plaintiffs' attorneys were able to spend on other billable accounts, particularly during peak periods in the litigation. (Grimit Aff. ¶ 8; Perry Aff. ¶¶ 14–15; Blackwell Aff., Ex. N.) The amount of work performed by Plaintiffs' attorneys and their staff on this case often required redistribution of workloads within the firm, causing an adverse effect on overall firm economics and on employee morale. (Perry Aff. ¶¶ 12, 14–16; Grimit Aff. ¶ 8–9.)

#### g. Time Limitations Imposed by Client or Circumstances

"Priority work that delays the lawyer's other legal work is entitled to some premium." *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d at 718. As discussed above, counsel's other legal work was seriously delayed or redistributed in order to give priority to this case, particularly during peak litigation periods. (Grimit Aff. ¶ 8; Perry Aff. ¶¶ 14–15; Blackwell Aff., Ex. N.) Further, the liability trial was uniquely intensive in terms of length of trial days, number and management of exhibits, orchestration of inmate and corrections witnesses, and the selective presentation of evidence required to

compress the trial into the four-week period allotted. (Perry Aff. ¶ 13.)

#### h. Conclusion Regarding Rates

Considering the above factors, I conclude that the rates requested by Plaintiffs' counsel for all attorneys, paralegals, and law clerks are reasonable and should be adopted and used to calculate the lodestar.

### 2. Calculation of Hours Reasonably Expended

■ The manner in which Plaintiffs' counsel have calculated hours reasonably expended on this litigation has been described in detail in section (B)(1), above.

#### a. Time and Labor Required

After reducing the hours actually expended on this litigation as described in section (B)(1), above, the total number of hours reasonably expended in representing Plaintiffs in this case is as follows for each primary timekeeper:

| | |
|---|---|
| Robert T. Grimit | 471.3 hours |
| Gail S. Perry | 1,684.8 hours |
| David A. Dudley | 955.7 hours |
| Stephanie F. Stacy | 187.8 hours as attorney |
| | 77.9 hours as law clerk |
| Susan L. Blackwell | 1,543.9 hours |
| Kirsten L. Gregory | 202.2 hours |
| | 5,123.6 hours |

(Blackwell Aff., Exs. L & M.) Plaintiffs wish to add to these figures 216 hours for telephone calls, 177.4 hours for correspondence, and 214.5 hours for preparation of the fee application. (Blackwell Aff. ¶¶ 15, 16, 17 & Exs. M, S.) An average hourly billing rate for all primary timekeepers of $105.00 per hour was multiplied by telephone and correspondence hours, while each timekeeper's individual hourly rate was multiplied by the hours outlined in the table above and by the fee-application hours. (Blackwell Aff. ¶¶ 15, 16 & Exs. L, S.) Thus, the total number of hours claimed to have been reasonably expended on this case is 5,731.5 and may be summarized as follows:

| Robert T. Grimit | Total Hours |
|---|---|
| 471.3 hrs. | 471.3 |
| Gail S. Perry | |
| 1,684.8 hrs. + 42.8 hrs. (fee app.) = | 1,727.6 |

| David A. Dudley | Total Hours |
|---|---|
| 955.7 hrs. | 955.7 |
| Stephanie F. Stacy | |
| 187.8 hrs. (atty.) + 71.1 hrs. (fee app.) = | 258.9 |
| 77.9 hrs. (law clk.) | 77.9 |
| Susan L. Blackwell | |
| 1,543.9 hrs. + 72.0 hrs. (fee app.) = | 1,615.9 |
| Kirsten L. Gregory | |
| 202.2 hrs. + 28.6 hrs. (fee app.) = | 230.8 |
| | 5,338.1 |
| Telephone Calls | 216.0 |
| Correspondence | 177.4 |
| | 5,731.5 |

#### b. Novelty and Difficulty of Issues

Although Plaintiffs' attorneys had familiarity with prisoner civil rights cases when they were appointed to represent Plaintiffs, this case, in addition to containing a myriad of constitutional issues, involved many issues of first impression in this district. As such, the investigation, preparation, presentation, and briefing of this case required more time and effort on counsel's part than would be involved in a typical civil rights case. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d at 718 (cases of first impression require more time and effort on attorneys' part).

#### c. Conclusion Regarding Hours Reasonably Expended

Again considering the above factors, I conclude that the hours requested by Plaintiffs' counsel for all attorneys, paralegals, and law clerks are reasonable and should be adopted and used to calculate the lodestar.

### 3. Calculation of the Lodestar

The lodestar requested by Plaintiffs' counsel may be summarized as follows:

| Robert T. Grimit | Total Fee |
|---|---|
| 471.3 hrs. × $150 (rate) = | $70,695.00 |
| Gail S. Perry | |
| 1,727.6 hrs. × $120 (rate) = | $207,312.00 |
| David A. Dudley | |
| 955.7 hrs. × $100 (rate) = | $95,570.00 |
| Stephanie F. Stacy | |
| 258.9 hrs. (atty.) × $90 (rate) = | $23,301.00 |
| 77.9 hrs. (law clk.) × $35 (rate) = | $2,726.50 |
| Susan L. Blackwell | |
| 1,615.9 hrs. × $50 (rate) = | $80,795.00 |

Kirsten L. Gregory

| | Total Fee |
|---|---|
| 230.8 hrs. × $35 (rate) = | $8,078.00 |

| | | |
|---|---|---|
| | **Subtotal:** | $488,477.50 |
| Telephone Calls 216.0 hrs. × $105 = | | $22,680.00 |
| Correspondence 177.4 hrs. × $105 = | | $18,627.00 |

| | |
|---|---|
| **Total Lodestar Requested:** | $529,784.50 |
| **Total Hours for all Timekeepers:** | 5,731.50 |

From the above figures, I have calculated the lodestar in the following manner: (1) total hours allowed for lawyers is 3,413.50 with a weighted effective rate [6] for lawyers of $116.27 per hour; (2) total hours allowed for law clerks is 308.70 with a weighted effective hourly rate of $35.00; (3) total hours allowed for the paralegal is 1,615.90 with a weighted effective hourly rate of $50.00; and (4) total hours allowed for telephone and correspondence is 393.40 with a weighted effective hourly rate of $105.00. The net result is a total of 5,731.50 hours allowed, with a weighted effective average for all timekeepers of $92.43 per hour, for a lodestar fee of $529,-784.50. A summary of these calculations follows:

### SUMMARY

| | |
|---|---|
| Total hrs. claimed and allowed: | 5,731.50 |
| Total fees allowed: | $529,784.50 |
| Weighted effective rate/all: | $92.43 |
| Total hrs. claimed/allowed for lawyers: | 3,413.50 |
| Total fees allowed for lawyers: | $396,878.00 |
| Weighted effective rate/lawyers: | $116.27 |
| Total hrs. claimed/allowed for law clerks: | 308.70 |
| Total fees allowed for law clerks: | $10,804.50 |
| Weighted effective rate/law clerks: | $35.00 |
| Total hrs. claimed/allowed for paralegals: | 1,615.90 |
| Total fees allowed for paralegals: | $80,795.00 |
| Weighted effective rate/paralegals: | $50.00 |
| Total hrs. claimed/allowed for telephone calls and correspondence: | 393.40 |
| Total fees allowed for telephone calls and correspondence: | $41,307.00 |
| Weighted effective rate for telephone/correspondence functions: | $105.00 |

**6.** The "weighted effective rate" for lawyers was calculated by multiplying the approved hours for each lawyer times the market or approved rate for that lawyer. The totals for each lawyer were

## D. Reduction for Partial or Incomplete Success

In *Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983), the Supreme Court recognized that the product of hours reasonably expended on the litigation times a reasonable hourly rate may be excessive if the plaintiff has achieved only partial or limited success. "There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment." *Id.* at 436–37, 103 S.Ct. at 1941.

### a. Partial Success

"[W]here the plaintiff advances discrete, essentially unrelated claims, and prevails on some but not others, it should not be compensated for work on the unsuccessful claims." Alan Hirsch & Diane Sheehey, *Awarding Attorneys' Fees and Managing Fee Litigation* at 27–28 (Federal Judicial Center 1994) (footnotes omitted) (citing *Hensley*). "However, in the majority of cases, courts have rejected the contention that the lodestar should be adjusted downward for unsuccessful claims, usually finding that the successful and unsuccessful claims were legally or factually intertwined or that counsel devoted most of its time to the litigation as a whole." *Id.* See *Casey v. City of Cabool,* 12 F.3d 799, 806 (8th Cir.1993), *cert. denied,* — U.S. —, 115 S.Ct. 325, 130 L.Ed.2d 285 (1994) (when party prevails, fee award should not be reduced merely because party did not prevail on every theory raised in the lawsuit; the "dispositive consideration" is "whether the issues upon which plaintiff's counsel spent time are interrelated to the central issues of the case").

Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be

then added together, and that total was then divided by the total number of hours attributed to lawyers as a class. The same procedure was followed for each class of timekeeper.

devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983).

This case involved a central issue derived from a common core of facts and four related legal theories—that is, the systematic constitutional inadequacy of most programs and services offered to NCW inmates. The *Klinger* court essentially examined seven NCW program or service areas—ranging from employment and economic programs to the constitutional adequacy of the law library and medical services—in deciding what was basically one claim: whether such programs and services violated constitutional norms. *Klinger I,* 824 F.Supp. at 1455–63 & 1464–66 (claims outlined).

Therefore, Plaintiff's successful access-to-the-courts claim was factually and legally intertwined with Plaintiffs' other constitutional challenges to NCW programs and services. *See Hensley,* 461 U.S. 424, 427 & 438, 103 S.Ct. 1933, 1936 & 1942 (court found constitutional violations in five of six general areas at state hospital unit for the involuntarily confined—physical environment, individual treatment plans, least restrictive environment, privileges, and seclusion and restraint; court found "interrelated nature of the facts and legal theories"). Indeed, this is clearly not a case where "counsel's work on one claim [was] unrelated to [her] work on another claim." *Id.* at 435, 103 S.Ct. at 1942. (Perry Aff. ¶ 27.)

Therefore, I find that there is no justifiable basis for reducing the lodestar for partial success because the claims in this case were related, both legally and factually.

### b. Incomplete Success

▮▮▮▮ "[E]ven if claims are closely related, or there is just one claim, a downward adjustment to the lodestar may be appropriate if the plaintiff achieved only limited success. In such a case, the gauge of success is the result of the lawsuit in terms of relief. . . ." Alan Hirsch & Diane Sheehey, *Awarding Attorneys' Fees and Managing Fee Litigation* at 29 (Federal Judicial Center 1994). "The result is what matters." *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940.

I conclude that the lodestar must be dramatically reduced for incomplete success because Plaintiffs have not prevailed in six out of the seven program areas challenged, *Klinger IV,* 902 F.Supp. at 1042 & 1044 (damages trial only on finding that two defendants violated Plaintiffs' constitutional right to access to the courts; *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), violation proven as to general population and segregation/orientation inmates), and because Plaintiffs were only about 50 percent successful on their access-to-the-courts claim, *Klinger I,* 824 F.Supp. at 1459 & 1464 (Plaintiffs proved *Bounds* violation, but did not prove equal protection violation); *Klinger II,* 31 F.3d 727 (8th Cir.1994) (Plaintiffs' equal protection claim dismissed).

Thus, the lodestar must be reduced as follows:

| | |
|---|---|
| Lodestar: | $529,784.50 |
| Expenses: | $ 50,821.71 |
| Reduction for Not Prevailing on Six of Seven Claims: | 6/7 or 86% |
| Further Reduction for Prevailing on Half of One Successful Claim: | 7% |
| **Final Attorney Fees:** | **$ 37,084.92** |
| **Final Expenses:** | **$ 3,557.52** [7] |

### c. Conclusion Regarding Award

I have therefore determined to award counsel for Plaintiffs the sum of $37,084.92 in attorney fees (seven percent of the lodestar of $529,784.50) and $3,557.52 in expenses (seven percent of the $50,821.71 in expenses

---

7. A "reasonable attorney's fee" under 42 U.S.C. § 1988 "must also take account of other expenses and profit." *Missouri v. Jenkins,* 491 U.S. 274, 285, 109 S.Ct. 2463, 2470, 105 L.Ed.2d 229 (1989). Therefore, the expenses requested must also be reduced by seven percent as part of the attorney's fee award.

requested). This attorney fee award provides weighted effective hourly rates of approximately $6.47 for all timekeepers; $8.14 for lawyers; $2.45 for law clerks; $3.50 for paralegals; and $7.35 for telephone and correspondence tasks.

I am as personally troubled by this award as anything I have ever done as a judge. In this age when lawyers are attacked for various and sundry reasons, some good, but most bad, the conduct of appointed counsel in this case stands as a shining tribute to the legal profession. Unfortunately, the law, at least as I read it, does not permit me to recognize in monetary terms anything close to the value of the work these fine lawyers expended in this case. I am truly sorry.

### E. Upward Adjustment

Because the court has used the reasonable hourly rates requested by Plaintiffs' counsel for each class of timekeepers, Plaintiff does not request an enhancement to produce a reasonable attorney fee. (Br. Supp. Pls.' Appl. Attorney Fees & Expenses at 36–37.)

IT IS ORDERED:

(1) Plaintiffs' motion (filing 723) requesting an award of attorney fees and expenses is granted in part and denied in part, and the plaintiffs are awarded $37,084.92 in fees and $3,557.52 in expenses, for a total attorney fee award of $40,642.44; and

(2) Final judgment shall be entered by separate document contemporaneously with the filing of this memorandum and order.

### JUDGMENT

Judgment is entered in favor of the Plaintiffs and against the Defendants Victor Lofgreen and Larry Tewes for $2.00 in nominal damages and attorney fees (and costs) of $40,642.44 regarding the access-to-the-courts claim, and as to all other claims Judgment is entered in favor of the Defendants and against Plaintiffs, providing that Plaintiffs shall take nothing and this case as to those claims is dismissed.